## WEST SIDE TENNIS CLUB v. COMMISSIONER OF INTERNAL REVENUE.
### No. 54.

Circuit Court of Appeals, Second Circuit.

April 15, 1940.

---

Lawrence A. Baker, of Washington, D. C. (John A. Selby, Henry Ravenel and Henry H. Elliott, all of Washington, D. C., of counsel), for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Edward M. English, Sp. Assts. to Atty. Gen., for respondent.

Before SWAN, AUGUSTUS N. HAND, and PATTERSON, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The principal question before us is whether the West Side Tennis Club was subject to income taxes for the years 1933 and 1934. The answer is determined by the effect to be given to Section 103(9) of the Revenue Act of 1932 and Section 101(9) of the Act of 1934, 26 U.S.C.A.Int.Rev. Code, § 101(9), which grant exemption from income taxes to: "Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder."

The taxpayer was incorporated under the Membership Corporation Law of the State of New York, Laws 1895, c. 559, in 1902. Its certificate of incorporation states that: "The particular objects for which the corporation is to be formed are to provide and maintain Lawn Tennis Courts and the buildings and accommodations appertaining thereto, for the use of its members, and to promote social intercourse among the members thereof."

The corporation has never issued bonds or certificates of stock. Its members have become such through election and payment of initiation fees and dues. In 1912 it purchased land at Forest Hills, Long Island, which it occupied during the years 1933 and 1934. The questions raised by this appeal arise because of earnings derived by the taxpayer from the national championship tennis matches during the two years last mentioned. These matches were first held on the courts of the taxpayer at Forest Hills in 1914, having been previously held at Newport. To accommodate spectators it was necessary to erect temporary stands annually at a cost of about $10,000, to the inconvenience of the club members for a period of about three months each year and to the injury of the grounds. If such conditions were to continue the holding of the national matches on the club grounds would be impracticable. Accordingly, pursuant to the desire of the United States Lawn Tennis Association to obtain a permanent stadium for the matches, the Association and the taxpayer made an agreement in February, 1923, whereby the latter was to erect a stadium with a seating capacity for not less than 12,000 spectators in return for which the Association was to award certain matches to the taxpayer for a ten year period and to receive a certain part of the receipts from sales of tickets for the matches. In May 1925, it having become apparent that the stadium had greatly exceeded in cost the amount of the original estimates and that it had increased the operating expenses of the club, a further agreement was made whereby the Association was to make loans of $6,000 annually for a period of eight years which were to be repaid, if possible, out of the club's share of the proceeds of tickets derived from the major tournaments. In January, 1933, the club and the Association made a further agreement covering a period of ten years more, wherein the taxpayer acknowledged an indebtedness for the loans made to it under the 1925 agreement and was granted a share of the proceeds from the sale of tickets.

During the taxable years the facilities of the taxpayer, available only to members and their guests, consisted of 28 grass courts, 32 clay courts, 5 fast drying courts and a club house with the usual recreational, dining, locker and shower rooms. The public had no access to the premises of the taxpayer except during the playing of matches awarded by the Association. The public by purchasing tickets had access to the stadium and courts assigned for matches.

At the end of the year 1933 the taxpayer was indebted to the Association to the

amount of $30,600 and upon the bond and mortgage executed when the stadium was built to the sum of $75,000 and had a surplus amounting to $225,720.83. At the end of 1934 the taxpayer owed the Association $70,000, owed $24,800 on the bond and mortgage and had a surplus of $219,140.74. The surplus for each year was computed after deducting reserves for depreciation. The loss from club operations (not including major tournaments) was $11,879.53 in 1933, and $17,467.66 in 1934, which left a balance of net income of $8,553.24 in 1933 and a deficit of $6,580.09 from all operations in 1934. The foregoing net balances were readjusted by the Commissioner by reducing the amounts which had been charged by the taxpayer for annual depreciation so that the net income for 1933 as readjusted was $21,693.84, and for 1934 $6,330.47.

The Board held that the taxpayer had not established exemption from income taxes and determined deficiencies for each year on the basis of the net income as adjusted by the Commissioner. We think that its decision was right and should be affirmed.

While the taxpayer was undoubtedly "organized * * * exclusively for pleasure, recreation, and other nonprofitable purposes", it cannot be said that it was so operated. The major tennis tournaments were not exclusively for the pleasure or recreation of the members. It was not and cannot be shown that no part of the net earnings inured "to the benefit of any private shareholder." In reality the situation is much the same as though the members had gone into the business of selling tickets for athletic events in order to make money and had then used the profits to finance a club in which they were interested. In the present case a substantial and profitable business was conducted, though for a limited time each year, which had only an indirect relation to the recreational objects of the club. An important, if not a primary, reason for holding the major tournament operations was the benefit of the members, for they would have had to pay larger dues or restrict club operations uncomfortably unless profits had been realized by the club from outsiders who were willing to purchase tickets for the great annual tennis matches.

In Jockey Club v. Helvering, 2 Cir., 76 F.2d 597, 598, we dealt with a similar situation and held that to secure exemption for a club "the returns from transactions with outsiders, taken by and large, shall be no more than a reimbursement of their cost to the club; shall not be a source of income". It is easy to see why Congress limited the exemption of clubs to those "organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder", because otherwise it would have been a simple matter to tack a profitable business on to a club that was having difficulty in carrying as large and luxurious a plant as the members might like without the payment of burdensome dues. We do not suggest that the members might not conduct a profitable tournament which would have the effect of lowering their dues so long as the earnings from the tournament were not derived from the public. It may also be that they could sell or lease a portion of their property which had been acquired for club purposes if the profits realized only constituted an incidental, trifling or non-recurrent contribution to the income. Such was the situation in Santee Club v. White, 1 Cir., 87 F.2d 5; Koon Kreek Klub v. Thomas, 5 Cir., 108 F.2d 616. In Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 205, 68 L.Ed. 458, the exemption of a charitable institution was considered by the Supreme Court, and it was held that derivation of net income from rents, as well as a small income from sale of "wine, chocolate and other articles" did not deprive the respondent, a corporation sole, of its exemption. The benefit which the public derives from the activities of private charities and the necessity for allowing charitable organizations to make their "properties productive to the end that the income may be thus used" were stressed by the court, which also pointed out that there no part of the profits could inure to the benefit of members of a corporation sole who "have, among other vows, that of poverty". The trade in wine and chocolate was merely a dealing in articles bought and sold within the organization, and the transactions were not directed to the end of financial gain.

In the case at bar a large business bringing in a net operating income of more than half the gross income derived from the dues and ordinary activities of the club precludes an exemption of the taxpayer as a club operated "exclusively for pleasure, recreation and other non-profitable purposes". The members may have enjoyed

the prestige which came to their club from the annual matches yet these matches to some extent interfered with their club privileges and were in the main simply a means of carrying the expenses of the club by means of profits obtained from the public.

The taxpayer argues that in any event the initiation fees and dues received during the taxable years were not income. But they were included in income in the income tax returns filed after the taxpayer realized that the Commissioner insisted the club was subject to taxation. Moreover, they were carried as income in the report of the treasurer for those years and used as income to pay operating expenses.

The Commissioner imposed 25% penalties for failure to file returns within the prescribed time because the taxpayer had not established that the failure was due to reasonable cause as required by Sec. 291 of the Revenue Act of 1932, 26 U.S.C.A.Int. Rev.Acts, page 566. We regret that the imposition of this penalty which the Board has affirmed is necessary, for the liability of the club to taxation was by no means clear. Nevertheless the burden of establishing reasonable cause was upon the taxpayer and it has not shown a timely effort to get advice or to secure a ruling and has rested its case on the finding of the Board that the officers and directors believed that it was exempt. But this, without more, was not sufficient. As the Board correctly said: "We do not know the steps taken by petitioner to ascertain its status as a taxpayer, and without knowledge of the basis for the belief of its officers and directors that it was exempt from tax we are in no position to test the reasonableness of the conclusion."

Order affirmed.