## AVIATION CLUB OF UTAH v. COMMISSIONER OF INTERNAL REVENUE.
### No. 3465.

Circuit Court of Appeals, Tenth Circuit.
June 30, 1947.

Paul H. Ray, of Salt Lake City, Utah (S. J. Quinney, of Salt Lake City, Utah, on the brief), for petitioner.

Howard P. Locke, Sp. Asst. to Atty. Gen. (Sewall Key, Acting Asst. Atty. Gen., and Helen R. Carloss, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before BRATTON, HUXMAN, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

■ By this appeal, we are asked to review the holding of the Tax Court to the effect that the Aviation Club of Utah was not in the years 1942 and 1943 exempt from income taxes under Section 101(9), Title 26 U.S.C.A. Internal Revenue Code, as a club "organized and operated exclusively

for pleasure, recreation, and other non-profitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder." The Commissioner determined that the extraordinary revenue realized from the operation of the Club during the years 1941, 1942 and 1943, took it out of the exempt status contemplated by Section 101(9). The Tax Court held that the income for the taxable year 1941 was sufficiently incidental to the permissible purposes of the Club to come within the exemption, but that the income for the taxable years 1942 and 1943 was so completely disproportionate to the nonprofitable purposes of the Club as to render it taxable for those years. Our sole question is whether or not there is warrant in the record and a reasonable basis in the law for the decision of the Tax Court. The facts are not in dispute.

Petitioner was organized in 1940 by thirty persons living in or near Salt Lake City who were interested in aviation. Each of the thirty persons loaned $100 to the Club, which was used to make the initial payment on a residence to be used as a clubhouse. In brief, the Articles of Incorporation and By-laws of the Club provided for a nonprofit corporation without capital stock. Its purposes were to promote the interest of aviation, and sponsor cultural, fraternal, social and educational activities for its members. No profits were to be distributed to any of the members, except in the case of dissolution of the corporation.

The Club, being without funds, entered into an agreement with one Jensen to furnish, equip and operate the Club for 20 to 40 per cent of the profits, depending upon the amount realized. The agreement also provided that upon its termination, the Club could acquire title to the furniture and equipment for the amount of Jensen's investment therein. As manager of the Club, Jensen was subject at all times to the directions of the Board of Directors with respect to the kind of service to be rendered, prices charged, and the general policy of the Club. Since the organization of the Club, regular members have paid monthly dues of $2.00.

Only members who paid dues were permitted to vote and hold office; no initiation fees were charged; the clubhouse was not open to the public; however members were allowed to bring guests, and "guest members" who were out-of-town friends of regular members were also accorded privileges of the Club. They were issued guest cards, but were not charged any dues, nor were they permitted to vote as regular members.

In the early part of 1942, the headquarters of the Ninth Service Command was moved to Salt Lake City, and the Army Air Force established a number of bases nearby, as a result of which there was a tremendous influx of military personnel, and all facilities in the Salt Lake City, area became quickly overtaxed. U. S. O. centers were established for enlisted men, but there were no comparable places of recreation for officer personnel. To meet this exigency, those charged with the responsibility of maintaining the morale of officers called upon all private clubs in the area to open their doors to army officers. The Chamber of Commerce of Salt Lake City participated in the appeal for all clubs to make their facilities available to officers as a patriotic duty.

Petitioner responded to this request, and the uniform of an officer became sufficient credentials for admittance to the Club, and to receive a "guest membership" card to be used during his stay in Salt Lake City. As such, he was entitled to the same privileges of the Club, and at the same prices as regular members. During 1942 and 1943 thousands of officers availed themselves of the Club's facilities, and there is no dispute that the food and drink furnished on the premises was the best obtainable, at prices comparable to other places of business. At times the Club was so crowded, it was necessary to refuse admittance to guest members, but regular members were always permitted to use the "east door". The average number of members in 1941 was 212, 162 in 1942 and 154 in 1943. Between 3,000 and 4,000 guest cards were issued during 1942, and between 9,000 and 10,000 during 1943. The total reve-

nue of the Club during 1941 was $14,881.-70; $111,606.37 in 1942; and $268,103.43 in 1943, the greater portion of which was derived from the bar and slot machines, and the balance from meals, music box and rooms.

None of the income of the Club has been distributed to its members, except that the thirty charter members were repaid their original loan of $100. In 1945, the Club exercised its option to purchase the furniture and equipment in the Club belonging to Jensen at a price of $28,000, and made extensive plans for improvement of the property. After V-J Day in 1945, the practice of admitting officers as guest members was discontinued, and the Club received letters from the various commanding officers expressing their gratitude for courtesies extended by the Club to military personnel during the war.

In holding that the revenue derived from the operation of the Club for the taxable years 1942 and 1943 was taxable as corporate income, the Tax Court cited and relied upon those related cases which hold in effect that where a Club of this kind, otherwise exempt under Section 101(9), engages in extra activities amounting to a substantial and continuing business for profit, the revenue from which inures to the benefit of the members, although not distributed, it loses its exempt status. West Side Tennis Club v. Commissioner, 111 F. 2d 6, 130 A.L.R. 103, certiorari denied 311 U.S. 674, 61 S.Ct. 40, 85 L.Ed. 434; Jockey. Club v. Commissioner, 2 Cir., 76 F. 2d 597.

Those cases draw a clear distinction between clubs which operate a substantial and continuing business, the revenue from which inures either directly or indirectly to the benefit of the members in the nature of permanent club improvements, and those which operate a business venture for profit, yet such profits do not and cannot inure to the benefit of the members, but support and maintain a wholly exempt organization, Trinidad v. Sagrada Orden, etc., 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458; Roche's Beach, Inc. v. Commissioner, 2 Cir., 96 F. 2d 776; Debs Memorial Radio Fund v. Commissioner, 2 Cir., 148 F.2d 948, or those cases where the revenue is derived from isolated transactions, such as a sale of a part of its property, Santee Club v. White, 1 Cir., 87 F.2d 5; Koon Kreek Klub v. Thomas, 5 Cir., 108 F.2d 616. See also Annotation 130 A.L.R. 107.

The Tax Court pointed out that in our case, the revenue derived from the operation of the Club was not merely incidental or indirectly related to the exclusive operation of the Club for pleasure, recreation and other nonprofitable purposes. It was emphasized that the greatly disproportionate revenue was derived from the operation of the Club through an arrangement with the manager Jensen, who was operating the Club on a percentage basis, and that the Club realized a profit along with Jensen; that those profits thus realized were used to improve the facilities of the Club, which the members would thereafter enjoy at no cost to themselves. In sum, the Court was of the opinion that the Club conducted a substantial and profitable business during the taxable years which had only an indirect relation to the original purpose for which it was created, thus destroying its tax exempt status.

The factual line between taxability and nontaxability is not clearly definable, nor always consistent. See Scofield v. Corpus Christi Golf & Country Club, 5 Cir., 127 F.2d 452; Coeur D'Alene Country Club v. Viley, D.C., 64 F.Supp. 540. But it is clear that when a club, otherwise exempt, engages in a business from which it derives profits from outside sources wholly disproportionate to its nontaxable purposes, and such profits inure to the benefit of its members in the nature of permanent improvements and facilities, it loses its exempt status under the definitive provisions of the statute. It should be noted that to be exempt from taxation, the club must not only be organized exclusively for pleasure, recreation and other nonprofitable purposes, but it must be operated exclusively for those purposes as well.

We have no doubt that the activities of the Club during the years 1942 and 1943, resulting in very substantial profits, although prompted by purely patriotic motives, amounted to a substantial business,

and that the profits thus realized did inure to the benefit of the members. The predominant activity of the Club during these years was the business of selling entertainment to persons other than members, which was certainly not incidental to its organizational purposes.

The judgment is affirmed.