## NATIONAL MAH JONGG LEAGUE, Inc., v. UNITED STATES.

District Court, S. D. New York.

Dec. 18, 1947.

Martin N. Whyman, of New York City (Martin N. Whyman and Bernard Liles, both of New York City, of counsel), for plaintiff.

John F. X. McGohey, U. S. Atty., of New York City (Jay Slonim, Asst. U. S. Atty., of New York City, of counsel), for defendant.

GODDARD, District Judge.

Plaintiff, National Mah Jongg League, Inc., sues to recover taxes and penalties amounting to $5,722.82 collected by the Bureau of Internal Revenue after its petition for tax exemption under Section 101 (6) (9)* of the Internal Revenue Code of 1939, 26 U.S.C.A. Int.Rev.Code, § 101 (6, 9), and the corresponding provision of prior Revenue Acts were denied by the Bureau of Internal Revenue.

The tax years involved cover the period beginning April 1, 1939 and ending March 31, 1945, and include Income Taxes, Declared Value Excess Profits Taxes, Social Security Taxes, and Capital Stock tax.

The plaintiff sues to recover the several taxes but the case was tried and submitted solely on the basis of an exemption from income tax, for if exempt under 26 U.S. C.A. Int.Rev. Code, § 101 (6) (9) [Income tax] plaintiff is exempt under Section 1201, 26 U.S.C.A. Int.Rev.Code, § 1201, from the Capital Stock tax, and if exempt under Section 1201 it is then exempt under Section 600, 26 U.S.C.A. Int.Rev.Code, § 600, from Declared Value Excess Profits tax.

A corporation exempt from income tax may still be subject to Social Security tax. Section 1426, Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 1426; Better Business Bureau v. United States, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67; but if the corporation is not exempt from Income Tax, it is not exempt under Section 1426 Social Security tax and it does not appear from the record that the League is otherwise exempt.

The plaintiff is a membership corporation, incorporated under the laws of the State of New York on October 29, 1937.

---

* I.R.C. Section 101.

"The following organizations shall be exempt from taxation under this chapter—

"(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantal part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;
* * *

"(9) Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder."

"Reg. 111, Sec. 29. 101(6)–I. Religious, charitable, scientific, literary, and educational organizations and community chests.—In order to be exempt under section 101(6), the organization must meet three tests:

"(a) It must be organized and operated exclusively for one or more of the specified purposes:

"(b) Its net income must not inure in whole or in part to the benefit of private shareholders or individuals; and

"(c) It must not by any substantial part of its activities attempt to influence legislation by propaganda or otherwise.

"Corporations organized and operated exclusively for charitable purposes comprise, in general, organizations for the relief of the poor."

"Reg. 111, Sec. 29. 101(9)–1. Social clubs.—The exemption granted by section 101(9) applies to practically all social and recreation clubs which are supported by membership fees, dues and assessments. If a club engages in traffic, in agriculture or horticulture, or in the sale of real estate, timber, etc. for profit, such club is not organized and operated exclusively for pleasure, recreation, or social purposes. Generally, an incidental sale of property will not deprive the club of the exemption."

Its charter provides in part as follows:

"SECOND: That the purposes for which said corporation is to be formed are as follows, viz:–

"(a) To promote, develop and standardize the game known as Mah Jongg.

"(b) To promote and foster a friendly spirit of comradeship and amity among its members.

"(c) To provide entertainment, diversion and the proper channels of social intercourse among the members of the corporation and their relatives and friends by means of common meeting rooms, receptions, parties and all other affairs usually associated with purely social organizations and which are best calculated to promote, advance and nourish the spirit of friendliness and companionship incident to such organizations."

The original By-Laws adopted shortly after the plaintiff incorporated, provided in part as follows:

"2. The object of this organization shall be to standardize the game of Mah Jongg and to promote sociability among the members.

"3. Any one interested in the game of Mah Jongg shall be eligible to membership, subject to the approval of the Board of Directors. * * *

    *    *    *    *    *    *

"20. The monies of the League shall be derived from the annual dues and from any other sources as approved by the Board of Directors.

"21. The dues shall be $.50 per annum and shall be payable immediately upon application and annually thereafter.

"22. The monies of the League shall be used for administrative purposes and for such other purposes as approved by the Board of Directors."

These By-Laws remained in force until 1941 when they were amended. The pertinent amendments provide as follows:

"3. Yearly applicants shall be eligible to membership. * * *

    *    *    *    *    *    *

"The League shall furnish to each member a list of the standard hands and rules adopted for the year."

    *    *    *    *    *    *

"Finances

"The monies of the League shall be derived from the annual dues, from the sale of lists and rules and from any other sources as approved by the Board of Directors.

    *    *    *    *    *    *

"The monies of the League shall be used for administrative purpose. The League shall establish a sinking fund and donate its surplus funds to worthy charities.

"If, at any time, this organization should disband, voluntarily or involuntarily, all monies remaining in the treasury, after payments of all just indebtedness, shall be distributed to charitable organizations."

In September, 1940, the League acquired quarters at 1819 Broadway, this city; until then meetings had been held from time to time at the residences of the officers and directors who were reimbursed for their use and expenses. Several times a year lists with the current rules of the game and winning hands were published by the League for distribution among its members. Up to 1939 the League's sole source of income was from dues paid by members, but this became insufficient to enable it to continue and the League decided to engage in the commercial enterprise of selling to the public its lists, tiles and other articles connected with the game of Mah Jongg. Branches of the League were also established in other cities, which were supplied with lists, tiles, etc. A branch League was allowed to retain 25 cents of the 50 cents collected for dues and if the membership of the branch exceeded one thousand members, 30 cents and 10 per cent of all billings to the trade for lists, tiles, etc.

The testimony of plaintiff is that the League has donated $14,094.32 to charities during the period in question, and after payment of taxes has on hand some $8,000. Most of these funds, if not all, were derived from the commercial sale to the public of lists, tiles, etc.

It seems impossible to determine accurately from the record just how much money was paid to the officers, directors and others for services and expenses over the period in question, but it appears [Exhibits J and I] that in June, 1939 fourteen directors and

officers received a total of $495 varying in amount from $10 to $75. On June 20, 1940, the following payments appear to have been made: President — $300; Vice-President —$150; Recording Secretary — $100; Treasurer, Financial Secretary, Corresponding Secretary — $200 each; twelve directors — $25 each. June 24, 1940 — directors — $60. April 25, 1941 — $10 each was paid to nineteen directors in addition to eight of them receiving a total of $275 for expenses in amounts varying from $25 to $50. In March, 1942 — $520 was paid for "services rendered by officers and directors 1941–2." Members distributing lists to the trade were allowed to retain two cents of the purchase price on each list purportedly to cover expenses incurred in the distribution.

During the tax periods in question other payments in varying amounts appear to have been made to officers and directors purportedly for services and expenses. It is difficult to reconcile these payments with the mandatory provisions of either Section 101(6) or (9) that no part of the net earnings shall inure to the benefit of a private shareholder or individual, and would seem to exclude the plaintiff from the exemption granted by the statute.

Prior to the amendment the By-Laws provided that "The monies of the League shall be used for administrative purposes and for such other purposes as approved by the Board of Directors." Certainly up to then the League could not, while engaged in this commercial enterprise, be classified as operating exclusively as a charitable organization. Nor was it at any time organized and operated exclusively for charitable purposes. It was organized for the purposes set forth in its charter, namely to promote the game of Mah Jongg. That later it voted to donate any surplus funds to charity does not, I think, entitle it to be classified as a corporation organized and operated exclusively for charitable purposes. Otherwise it would seem that any corporation organized for similar purposes might obtain tax exemption as a corporation organized and operating exclusively for charitable purposes by adopting a By-Law that any surplus funds shall be given to charity.

The distinction is clear between the situation at bar where the prime purpose of the corporation is to promote the game of Mah Jongg, and in cases where a corporation organized and operated exclusively for charitable purposes conducts a business and uses the profits to carry on the charitable purposes for which the corporation was organized.

Until the plaintiff engaged in the sale to the public of its lists and tiles, the dues from the members were insufficient to meet its current expenses. The gross income from the sales to the public of lists and tiles for the period from April 1, 1939, to April 1, 1945, was $91,674.55. The gross income from memberships was $34,082.18. According to the plaintiff's own figures the net profit from memberships was $3,894.69 and net profit from sale of lists and tiles was $25,172.85. The accountant for the Government testified that a proper re-allocation of expenses shows a loss of $6,837.76 from memberships and a profit of $35,114.30 from the sale of lists and tiles, which is probably more nearly accurate as the League had been operating at a loss from dues alone.

From 1939, when plaintiff engaged in the commercial enterprise of selling to the public lists and tiles, its income from the operation exceeded several times over the income derived from memberships and the ordinary activities for which the club was organized. It was this extra income which enabled the plaintiff to meet its deficit, carry on without an increase of dues or curtailment of operations; also to accumulate a substantial surplus. It was not an instance of profit inuring to the club members through use of the club's facilities. This clearly shows that the plaintiff was not operated exclusively for the social purposes for which the club was purportedly organized.

In West Side Tennis Club v. Commissioner of Internal Revenue, 2 Cir., 111 F.2d 6, 130 A.L.R. 103, certiorari denied 311 U.S. 674, 61 S.Ct. 40, 85 L.Ed. 434, the club was incorporated to provide lawn tennis courts for its members and it operated at a loss with the income derived from dues and the club's ordinary activities, but by erecting a stadium with a large seating

capacity for the holding of international and other championship matches and selling tickets to the public, it obtained a net operating income of more than half the gross income derived from dues and the ordinary activities of the club. It was held that the club was not exempt as a club operated "exclusively for pleasure, recreation, and other nonprofitable purposes," Judge Augustus N. Hand writing for the court, saying—

"While the tax payer was undoubtedly 'organized * * * exclusively for pleasure, recreation, and other nonprofitable purposes', it cannot be said that it was so operated. The major tennis tournaments were not exclusively for the pleasure or recreation of the members. It was not and cannot be shown that no part of the net earnings inured 'to the benefit of any private shareholder.' In reality the situation is much the same as though the members had gone into the business of selling tickets for athletic events in order to make money and had then used the profits to finance a club in which they were interested * * *. An important, if not a primary, reason for holding the major tournament operations was for the benefit of the members, for they would have to pay larger dues or restrict club operations uncomfortably unless profits had been realized by the club from outsiders who were willing to purchase tickets for the great annual tennis matches". 111 F.2d at page 8.

In Jockey Club v. Helvering, 2 Cir., 76 F.2d 597, referring to subdivision 9, the court says—

"This does not of course mean that a club may on no occasion make a profit without losing its exemption, but it does mean that the returns from transactions with outsiders, taken by and large, shall be no more than a reimbursement of their cost to the club; shall not be a source of income. If it turns out upon computation that they are such a source over a substantial enough period to justify the conclusion that this was deliberate * * * the club is making earnings which 'inure to the benefit' of the members." 76 F.2d at page 598.

In Roche's Beach, Inc., v. Commissioner of Internal Revenue, 2 Cir., 96 F.2d 776, a corporation organized by testator to operate his property, collect the income therefrom and turn it over to a charitable foundation created by his will, was held exempt from income tax as a corporation organized and operated exclusively for charitable purposes. The distinction between that case and the one at bar—there all the profits went for charitable purposes; here, the members of the club derived a substantial financial benefit from the enterprise.

I do not think that the plaintiff can be classified as a corporation organized and operated exclusively for charitable purposes and entitled to exemption under Section 101(6), or that it was organized and operated for nonprofitable purposes with no part of its earnings inuring to the benefit of any shareholder and exempt under Section 101(9).

A decree may be entered upon notice dismissing the complaint.

### Findings of Fact

1. Plaintiff, National Mah Jongg League, Inc., was incorporated October 29, 1937, as a membership corporation under the laws of New York.

2. The pertinent part of its charter provided that the purposes are "(a) To promote, develop and standardize the game known as Mah Jongg; (b) To promote and foster a friendly spirit of comradeship and amity among its members" * * *; "(d) All of the above activities to be conducted without profit to the corporation or its members, and all aid shall be voluntary, * * *." Its original By-Laws provided:

3. "The monies of the League shall be derived from annual dues and from any other sources approved by the Board of Directors * * *. Dues shall be $.50 per annum, * * *. The monies of the League shall be used for administrative purposes and for such other purposes as approved by the Board of Directors * * *."

4. In 1941 the By-Laws were amended to provide that "The monies of the League shall be derived from the annual dues, from the sale of lists and rules and from any other sources as approved by the Board of Directors. * * * The monies

774

of the League shall be used for administrative purposes. The League shall establish a sinking fund and donate its surplus funds to worthy charities. If at any time, this organization shall disband, voluntarily or involuntarily, all monies remaining in the treasury, after payments of all just indebtedness, shall be distributable to charitable organizations."

5. Lists with current rules of the game and winning hands published by the League were distributed to members several times a year.

6. Until September, 1940, when the League acquired quarters at 1819 Broadway, this city, meetings had been held from time to time at the residences of its officers and directors who were reimbursed for the use and for any expenses incurred.

7. Until 1939 the League's sole source of income was from dues paid by its members. This income became insufficient to meet its expenses and the League engaged in the sale to the public of its lists, tiles and other articles connected with the game of Mah Jongg.

8. Branches of the League were established in other cities which were supplied with lists, tiles, etc., the branches being allowed to retain 25 or 30 cents from the 50 cents dues collected, depending upon the number of members in the branch and 10 per cent of all billings to the trade for lists, tiles. etc.

9. Members distributing lists to the trade were allowed to retain two cents of the purchase price on each list purportedly to cover expenses incurred in the distribution.

10. With the exception of three tournaments and business meetings, no other functions were held by the League for its members since its inception.

11. The gross income from the sales to the public for the period from April 1, 1939, to April 1, 1945, was $91,674.55; the gross income from memberships was $34,082.18.

12. According to plaintiff's own figures the net profit from memberships was $3,894.69 and from the sales to the public $25,172.25. But, according to the testimony of the Government's accountant, a proper re-allocation of expenses shows a loss of $6,837.78 from memberships and a profit of $35,114.30 from sales of lists and tiles which is probably more nearly correct as the League had been operating at a loss from dues alone.

13. According to the testimony the League has donated $14,094.32 to charities during the period in question; and after payment of taxes has on hand some $8,000. Most of these funds, if not all, have been derived from its commercial sales to the public of lists, tiles, etc. It seems impossible to determine accurately from the record just how much money was paid to the officers, directors, and others for services and expenses over the period in question, but it appears [Exhibits J and I] that in June, 1939, fourteen directors and officers received a total of $495 varying in amount from $10 to $75. On June 20, 1940, the following payments appear to have been made: President—$300; Vice-President—$150; Recording Secretary—$100; Treasurer, Financial Secretary, Corresponding Secretary—$200 each; twelve directors—$25 each. On June 24, 1940, directors—$60. April 25, 1941—$10 each was paid to nineteen directors in addition to eight of them receiving a total of $275 for expenses in amounts varying from $25 to $50. In March, 1942—$520 was paid for "services rendered by officers and directors 1941–2." Other payments in varying amounts appear to have been made to officers and directors purportedly for services and disbursements during the period.

### Conclusions of Law

1. The plaintiff was not a corporation organized and operated exclusively for charitable purposes and is not entitled to income tax exemption under Section 101 (6).

2. The plaintiff was not a club organized and operated exclusively for pleasure, recreation and other nonprofitable purposes and no part of its net earnings of which inures to the benefit of any private shareholder.

3. The plaintiff is not exempt from the Capital Stock Tax, Excess Profits Tax, nor Social Security Tax.

4. The complaint is dismissed.