The **AUGUSTA GOLF ASSOCIATION, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 1384.

United States District Court,
S. D. Georgia,
Augusta Division.

Sept. 16, 1971.

James E. Johnson, Jr., Hull, Towill, Norman, Barrett & Johnson, Augusta, for plaintiff.

R. Jackson B. Smith, Jr., U. S. Atty., Augusta, Ga., Johnnie M. Walters, Asst. Atty. Gen., Washington, D. C., John F. Murray, Lawrence R. Jones, Attys., Dept. of Justice, Washington, D. C., for defendant.

## ORDER

### FINDINGS AND CONCLUSIONS

### OUTLINE OF CASE

LAWRENCE, Chief Judge.

This is a taxpayer suit against the United States to recover the sum of $11,861.05, consisting of $2,454.60 in federal income taxes; $303.29 as the 5% addition to such tax; $8,137.53 in federal wagering excise taxes, and $965.63 as the addition thereto. Statutory interest from dates of payment are sought. The taxable periods involved are the years ending June 30th 1960, 1961 and 1962.

The case was tried without a jury on December 10, 1970.

The Augusta Golf Association, Inc. ("Association") was organized without capital stock on March 24, 1949, as a

non-profit corporation under the laws of the State of Georgia. According to the Articles of Incorporation, the primary objects and purposes of the Association are "to encourage, foster and promote golf in Augusta, Georgia, including the right to sponsor, manage and operate golf tournaments, exhibitions and contests . . .." The Articles prohibit any part of net earnings from inuring to the benefit of any member or individual. No compensation has ever been paid to any of the officers or directors.

During the taxable periods in question the Association had a limited membership of seventy-five. All but one was a member of the Augusta Country Club. Membership was prestigious. Members paid nominal dues of $10 per year but were allowed as a credit against dues the amounts paid for attending certain functions of the Association. This practice resulted in the collection of only small sums *qua* dues. Dues and initiation fees collected during the three-year period amounted to $180, $60 and $220, respectively.

The functions sponsored by the Association were two annual golf tournaments, one for members only and one for members and their guests.[1] Incidental to the tournaments were social events, such as dinners, cocktail parties and the "calcuttas" hereinafter described. The cost of these functions was estimated in advance and was charged to participants therein as admission fees.

The Association had some income in the way of dues and interest from bank deposits. However, its funds were largely derived through a cut of 10% of the gross amount raised in the "calcutta" pools. I have been unable to determine the origin of the name but a golf calcutta is a system of wagering in which bids are made for competing golfers in an auction. The proceeds of the purchase of players are pooled for distribution to winners according to a scale of percentages.[2] The calcuttas were held as part of the Masters Golf Tournament and also the tournaments staged for the members themselves and their guests. During the early years of the Association the Masters calcuttas were open to the general public as ticketed events. During the years at issue attendance was limited to members of the Association and guests.

Practically all of the Association's income was derived from those events. For the fiscal year ending June 30, 1960, $14,651.12 of the $15,081.12 total income came from "jamboree" tournaments and the Masters party. The comparable figures for 1961 and 1962, respectively, were $27,145.01 of $29,215.01 and $44,945.24 of $47,435.24. These figures represent gross income before distribution of "prizes" to winners in the Masters calcutta.

## QUESTIONS PRESENTED

The issues in the case may be thus stated:

(1) Whether the Association is exempt from federal income taxes as a so-

---

1. They are called "jamborees."

2. In a deposition a witness who was President of the Association during one of the years concerned thus described the action at a calcutta:
   A. ". . . have you ever been to an auction?"
   Q. "No sir."
   A. "Well, like they auction off Gary Player and the bidding goes to $2,000. The Augusta Golf Association puts up $1,000 to start the ball rolling. Well, the $2,000 goes to $3,000 and this keeps on up like that. The board will say we now have so much in the pool. They all know how much they're bidding on and that will give them a guide as to how high they bid, you know, according to how much money they have a chance of winning. In other words, if the pool gets to around $20,000 like Gary Player sold for around $1,000, Palmer may come up after the pool is around $18,000 or $20,000 and Palmer will sell for $1,800 on account of the pool being built up, see."

cial club under section 501(c) (7) of the Internal Revenue Code of 1954.[3]

(2) Whether the Association is liable for federal excise taxes on wagering pools under section 4421.[4]

(3) Whether the Association is liable for additions to any such tax under section 6651 on account of willful neglect in filing a return.[5]

## I

### LIABILITY FOR FEDERAL INCOME TAX

■ To qualify as an exempt social club under 501(c) (7) the Association must prove, and the burden is on it to do so, that it was organized and is operated exclusively for pleasure, recreation, and other nonprofitable purposes and that no part of its net earnings inure to the benefit of a private shareholder or member.

■ While the operation of the calcuttas was the principal activity of the Association and was the source of its funds, that fact alone would not warrant a denial of tax exemption. In Rev.Rul. 69–68, 1969–1 Cum.Bull. 153 the Service ruled that a private club operated as a nonprofit organization was exempt from federal taxation notwithstanding the derivation of a principal part of its revenue from gaming devices. That ruling involved devices used not only for revenue purposes but for pleasure and recreation. The Service conceded, under the authority of Aviation Country Club, 21 T.C. 807 (1954), acq., 1954–2 Cum. Bull. 3, that "Maintenance of gaming

devices for members and guests of a club is an activity for their pleasure and recreation within the meaning of section 501(c) (7) of the Code." The Service has granted a tax exemption to a club whose principal income was derived from a bar and restaurant used by members and guests. Rev.Rul. 44, 1953–1 Cum.Bull. 109.

■ In the present case the Association was operated with the twin objectives of promoting golf in Augusta and vicinity and in providing recreation and pleasure to the members. The calcuttas served both purposes by furnishing funds to the Association and providing pleasure and amusement for the members through the use of gaming devices at social affairs at which they were a focal point. The "pleasure, recreation, and other nonprofitable purposes" are not exclusive of activities involving wagering devices as long as such activities do not amount to the conduct of business for profit. Under Rev.Rul. 69–68, *supra*, this is true even if the operation of the gaming devices were illegal under local law.

The present case is distinguishable from situations where business is being transacted with the general public. In Rev.Rul. 69–219, 1969–1 Cum.Bull. 153 a social club which held its golf course open to the general public and charged green fees used to maintain and improve club facilities was held to be subject to federal income taxes. Such business activities did not amount to exclusively nonprofitable organization and operation. On similar reasoning, a so-

3. "An organization described in subsection (c) . . . shall be exempt from taxation. . . ."
    "(7) Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder." 26 U.S.C.A. § 501(c)(7).

4. "(1) Wager.—The term 'wager' means—
    (A) any wager with respect to a sports event or a contest placed with a person engaged in the business of accepting such wagers,

(B) any wager placed in a wagering pool with respect to a sports event on a contest, if such pool is conducted for profit. . . ." 26 U.S.C.A. § 4421.

5. "In case of failure to file any return required . . . unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added . . . 5 percent of the amount of such tax. . . ." 26 U.S. C.A. § 6651.

cial club which received a substantial portion of income from rental of property and which used the proceeds to defray operating expenses and to improve and expand its facilities has been denied tax exemption. Rev.Rul. 69–220, 1969–1 Cum.Bull. 154.

In the instant case, during the years under consideration, the social affairs at which the calcuttas were featured were open only to members and their invited guests. Bids were not called in or mailed. Attendance at the social functions was related to the calcutta and other Association activities. The evidence does not support the finding that this was a sham or, as the Government contends, tantamount to making the calcuttas available to the general public.

■ The Government urges that the Association in actuality charged no dues since the assessments for attending functions absorbed the stated dues and were used to defray the expenses of the functions rather than promotion of golf. It contends that the profits of the Association inured to the private benefit of the members since in the absence of the calcuttas increased dues would have been payable.

Although $10 dues per year is a nominal amount nevertheless such charge was certain to be collected as a required fee from each member who did not attend a paying function. The fact that a member could credit his annual fee against an assessment is consonant with an inducement to attend functions of the Association and is not necessarily inconsistent with the theory that dues were in fact charged.

Treasury Regulations require that qualifying organizations be supported "solely" by membership fees, dues and assessments. They add, however, that "a club otherwise entitled to exemption will not be disqualified because it raises revenue from members through the use of club facilities or in connection with club activities." Treas.Reg. § 1.501(c)(7)–1(a) ; Rev.Rul. 44, *supra*.

The Government relies on such cases as National Mah Jongg League v. United States, 75 F.Supp. 769 (S.D.N.Y. 1947) ; West Side Tennis Club v. Commissioner of Internal Revenue, 111 F.2d 6 (2d Cir. 1940), cert. denied, 311 U.S. 674, 61 S.Ct. 40, 85 L.Ed. 434 (1940) ; Sabers of Denver v. United States, 16 A.F.T.R.2d 5992 (D.Colo.1965) and Spokane Motorcycle Club v. United States, 222 F.Supp. 151 (E.D.Wash.1963). In each of these cases the additional income was derived through profit-making business *with the public*. Such commercial element is not present here. The Association does not own any permanent meeting place or fixed physical assets to be benefited from its retained share of the calcutta-produced funds. The Association's functions were self-sustaining through assessment of the participants. The calcuttas brought together members and guests for social events and at the same time generated sufficient funds to cover the cost of the Association's current and future activities. Nobody made anything out of it.

■ The Government points out that less than 40% of the net income was applied to golf promotion. However, it appears that the excess of receipts over cost of activities was used either for the activities mentioned or as contributions to such things as the Pee Wee Golf Tournament, sponsoring young golfers in junior tournaments, contributing to golf tournaments, obtaining golf equipment for high school golf teams, purchasing and distributing golf tournament tickets to disabled veterans and military personnel, lending money to a prominent local golfer for the tour [6] and for building up a reserve to sponsor a major professional golf tournament or exhibition for the public to attend without charge. While the latter project never materialized it does not appear that the unexpended sums earmarked for that purpose were devoted to or intended

6. The Association lost $2,000 on this venture.

to be used for increased advantages, directly or indirectly, to individual members. The only financial benefit shown by the defendant to have accrued to the members was the sport coats for members bearing the emblem of the Association. In 1961–62 expenditures for this purpose amounted to $1,365.50. This is not inconsistent with the social nature of membership. The coats were apparently worn only at club functions. Sending flowers to sick members is not much of a financial benefit to an ailing person.

In the years at issue the calcuttas were not operated as a *business* with the general public but were conducted for members and invited guests. The events were directly related to the purposes for which the Association was operated. The retained share of pooled funds was not used for the financial benefit of any member.

To be exempt from federal income taxation under Section 501(c) (7) a social club must have been *organized* exclusively for the purposes stated. The Government argues that the original intention underlying the organization did not coincide with the purposes expressed in the Articles of Incorporation. According to the testimony, the twelve to fifteen charter members were familiar with the prior operation of profitable calcuttas at the Augusta Country Club. For several years after the Association was formed it conducted calcuttas open to the general public by the purchase of tickets. Attendance ranged from 500 to 600 persons. It was not until the early 1960's that the Association restricted participation to members and their invited guests.[7] The circumstances underlying its formation possibly evince a seminal intent, as far as the Masters calcutta was concerned, to deal with the general public.

██ However, I think that the appropriately expressed intent in the Articles of Incorporation controls rather than any ulterior motive of the incorporators. The organizational test is satisfied by the corporate charter and the Association was *organized* for the purposes stated. Whether it was *operated* in accordance therewith is a different matter.

Rev.Rul. 68–119, 1968–1 Cum.Bull. 268 is relevant. The ruling involved a social club organized to promote equestrian sports. Each year it put on a steeplechase open to the general public, spectators and competitors. The public was charged no more for admissions or entry fees than the club members. Prize money was paid from the entry fees and general expenses met by admission charges and by sale of programs and refreshments. The net proceeds were distributed to charity. The ruling states that since the events were incidental to and in furtherance of the purpose of the club and since it was not operated for profit but for the pleasure and recreation of the members the club was entitled to tax exemption.

Other cases involving social clubs which have more or less relevance to this case but which have not been referred to above include Clements Buckaroos, 21 TCM, Docket No. 89412 (1962); Barstow Rodeo and Riding Club, 12 TCM, Docket No. 36395 (1953); Aviation Club of Utah, 162 F.2d 984 (10th Cir., 1947).

In the instant case, participating members paid their portion of the costs of social affairs at the same rate charged nonmembers. The non-attending members derived no benefit whatever from these functions. During the period the calcuttas were open to the general public as well as in the restricted years they were an essential part of the Association's social and recreational activities as well as a means of financing its promotion of the Royal Game.

However, both in fact and law the social club exemption phase of this case is

---

7. The Masters calcutta was abandoned by the Association some years ago.

278

close. The decision could go either way. I have tergiversated for months, never quite sure of which way to jump. The Government has presented vigorous arguments against the views expressed by me and the findings of fact herein. I have pointed out that for years the general public attended the calcuttas. That more guests than members participated in the events in the years under review could evidence a continuation of an original intention to conduct the calcuttas with the public. The number of guests per member appears to have been unrestricted during the 1960–1962 period. The organizers of the corporation were aware of the large sums that participants in the Masters calcutta would risk in buying pros who they thought might win or finish among the first five. It is arguable that the calcutta was the *raison d'être* of the Association and that it was organized to capitalize on the potentiality for large wagering by nonmembers.

Be that as it may, I have concluded that the Association is exempt from federal income taxes as a social club. No profit motive underlay its formation. The membership, individually and collectively, has never profited other than in the way of the companionship of fellow golf devotees and the satisfaction of contributing to the promotion of golf through its share of the calcuttas.

Both from the organizational and operational standpoint the Association meets the statutory criteria, in my opinion. Plaintiff is entitled to recover the income taxes paid for the years at issue with interest thereon.

## II

### LIABILITY FOR EXCISE TAX ON WAGERING POOLS

Deficiencies were assessed for federal excise taxes due by reason of calcutta operations in 1960, 1961 and 1962. The Act of 1954 imposes an excise tax of 10% on wagers. 26 U.S.C.A. § 4401. The statute defines wager as "any wager with respect to a sports event or a contest placed with a person engaged in the business of accepting such wagers" as well as "any wager placed in a wagering pool with respect to a sports event or a contest, if such pool is conducted for profit." 26 U.S.C.A. § 4421(1) (B) (A). As stated previously, during the years 1960, 1961 and 1962 the Association held calcuttas exclusively for members and their invited guests, its percentage of the proceeds being used to promote golf currently or in the future.

In contending that plaintiff engaged in such a wagering business for profit the Government relies on United States v. D. I. Operating Co., 362 F.2d 305 (9th Cir. 1966); Edgewood American Legion Post #448 v. United States, 246 F.2d 1 (7th Cir. 1957), cert. denied, 355 U.S. 926, 78 S.Ct. 383, 2 L.Ed.2d 357 (1958); Hessman v. Campbell, 134 F.Supp. 416 (S.D.Ind.1955).

*D. I. Operating Co.* involved the operation of golf calcutta pools without charge to participants and at a direct loss to the taxpayer. The percentage reserved for contributions to the Damon Runyon Memorial Cancer Fund yielded less than the amounts guaranteed by the plaintiff to that charity. The Circuit Court of Appeals for the Ninth Circuit held that since the pools were conducted by plaintiff with the expectation of increased profits from its hotels, restaurants, bars and gambling operations at Desert Inn, such indirect benefits amounted to a "profit" motive and constituted a wagering pool within the meaning of Treas.Reg. § 44:4421(c) (4). In upholding the validity of that Regulation the Court referred to the Congressional Committee Reports accompanying the wagering tax statute. They reveal that the Act was intended to make "commercialized gambling" contribute to the need for increased revenue and that the tax was not meant to apply to the purely "social" or "friendly" type of betting pools "which are occasionally organized among friends or other associates . . .." H.Rep.No. 586, 82d Cong., 1st Sess., pp. 55–56; S.Rep.No. 781, 82d

Cong., 1st Sess., pp. 113–114. The excise tax imposed on wagers grew out of the investigations by the Kefauver Committee into nationwide, commercialized gambling.

In the instant case no benefit, direct or indirect, flowed to the members of the Association and since the pools were conducted during the years at issue as "social" or "friendly" gatherings "among friends or other associates" *D. I. Operating Co.* does not support the position of the defendant.

Nor is the defendant really helped by *Edgewood American Legion Post #448, supra.* There a lottery business of magnitude was conducted by high salaried employees of the Post who were trained and experienced in the wagering and lottery field. This is equally true of Hessman v. Campbell, *supra,* where the lottery was also run by highly compensated experts in order to raise a building fund and was "of such scope and magnitude as to constitute a business substantially unrelated to the purposes and functions" of the organization.

The Masters calcuttas as conducted by the Association did not constitute the acceptance of wagers placed with one engaged in such business and were not, as wagering pools, operated for profit within the intended meaning of that term in the statute. The plaintiff is not liable for the excise tax. The Association is entitled to recover the taxes paid by it with interest thereon.

## III

### ADDITIONAL TAX ON DELINQUENCY PAYMENTS

In view of the above rulings it is unnecessary to deal with the 5% additional tax arising because of willful neglect under § 6651 in failing to file a return. The additional tax which was paid is recoverable by the Association.

Plaintiff's counsel will submit a form of judgment in accordance with the foregoing.