ROCHESTER LIEDERKRANZ, INC.,
Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 139, Docket 71–1543.

United States Court of Appeals,
Second Circuit.

Argued Nov. 30, 1971.

Decided March 7, 1972.

Donald H. Olson, Atty., Tax Div., Dept. of Justice (Fred B. Ugast, Acting Asst. Atty. Gen., Meyer Rothwacks and Richard W. Perkins, Attys., Tax Div., Dept. of Justice, H. Kenneth Schroeder, Jr., U. S. Atty., W. D. N. Y., on the brief), for defendant-appellant.

Richard F. Anderson, Rochester, N. Y. (Martin, Dutcher, Cooke, Mousaw & Vigdor, Delon F. Mousaw and Martin S. Weingarten, Rochester, N. Y., on the brief), for plaintiff-appellee.

Before LUMBARD, WATERMAN and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

The issue on this appeal is whether tax liability arises out of plaintiff's operation of a ticket lottery during the years 1952 to 1964.[1] The Commissioner

---

1. The precise periods are from December 1, 1952 through September 30, 1963 with regard to the wagering tax and from June 30, 1953 to September 30, 1964 with regard to the special occupational tax.

of Internal Revenue made a timely assessment against plaintiff in the amounts of $579,541.24 for wagering excise taxes under 26 U.S.C. § 4401 and of $950 for the special occupational tax on wagering under 26 U.S.C. § 4411. Both sums included penalty and interest. Plaintiff paid $1,008.98 against this assessment and filed a claim for refund of that amount with the District Director of Internal Revenue in Buffalo, New York. The District Director denied the claim, and plaintiff pursued his cause in the United States District Court for the Western District of New York. There plaintiff was met by the Government's counterclaim for $579,482.26, representing the remaining unpaid portion of the Commissioner's assessment. Judge Harold P. Burke, sitting without a jury, ruled for the taxpayer and dismissed the Government's counterclaim. This appeal followed. We affirm.

I

The facts of this case are almost entirely undisputed. Plaintiff Rochester Liederkranz, Inc. is a workingman's social club formed under the membership corporation law of New York. The club was organized according to its by-laws to "provide a home for the benefit of members"; to promote "vocal music by the practice and performance of selected pieces"; and to cultivate "social life."[2] At all times relevant to this lawsuit plaintiff was exempt from federal income tax as a club

> organized and operated exclusively for pleasure, recreation, and other non-profitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder.

26 U.S.C. § 501(c) (7).

In addition to operating a bar, a restaurant and a bowling alley for the enjoyment of its members, the club also conducted drawings. These drawings "were provided for the amusement of the club members as part of the club's social activities and to help defray the expenses of the club."[3] Participation in the drawings was limited to members; the public was not involved.[4] Members could purchase tickets to the drawings at the club bar. Two types of tickets were sold: "Lucky Seven's," which cost 10 cents each and brought a prize anywhere from 50 cents to two dollars, and "Big Charlie's," which sold for 25 cents each and had a potential return of between two dollars and 20 dollars. Members fortunate enough to purchase a ticket with a winning number were usually paid immediately by the bartender out of the proceeds taken in from ticket sales. The bartenders were salaried and received no additional or special compensation for running the drawings.

The net proceeds from the sale of tickets "were mingled with the general funds of the club and used for its general purposes and to defray its losses from operations."[5] Without question, the profits derived from the drawings constituted an important source of revenue for the club. During the period December 1952 through September 1963, the club's receipts from the lottery amounted to almost $3,600,000, or 61 per cent of the club's total receipts from all sources. The club's net proceeds from the drawings for roughly the same period was almost $650,000. Even with this source of income, however, the club seldom saw a profitable year. The trial court found that:

> The club would not have been able to financially survive without the benefit of the drawings receipts, unless substantial changes were made in its financial structure. In order to survive, the club would have been forced to raise either its dues and initiation fees, its food, bar and bowling alley

2. Finding of Fact 6.

3. Finding of Fact 34.

4. During the years in suit, the club's approximate membership was 1,500 to 2,000 members.

5. Finding of Fact 31.

prices, or reduce the quality or extent of the services offered to its members.[6]

Despite the financial importance of the drawings to the club, the "fundamental nature of the social organization of the club never became secondary in importance to the drawings."[7] The trial court concluded that the "operation of the drawings contained no ear marks of a commercialized and profit-motivated organization or gambling business."[8]

## II

The basic issue in this case is whether plaintiff is liable for payment of taxes under sections 4401 and 4411 of the Internal Revenue Code, 26 U.S.C. §§ 4401, 4411. Section 4401 imposes an excise tax of 10 per cent on wagers; section 4411 imposes "a special tax of $50 per year to be paid by each person who is liable for tax under section 4401. . . ." The controversy to be resolved here, however, stems not from the phraseology of either of those sections but from the language of section 4421, 26 U.S.C. § 4421, which defines the term "wagers" as used in section 4401. The controversial portion of section 4421 is subsection (2) (B), which exempts from the wagering tax

> any drawing conducted by an organization exempt from tax under sections 501 and 521, if no part of the net proceeds derived from such drawing inures to the benefit of any private shareholder or individual.

The Government conceded in the trial court that plaintiff was qualified for an exemption under section 501 and took the position that the sole issue under section 4421(2) (B) was whether any "part of the net proceeds" which plaintiff derived from its drawings inured "to the benefit of any private shareholder or individual." The district court

found that there was no inurement within the meaning of section 4421(2) (B). We agree.

Although there is little legislative history or judicial precedent to guide us, we think it highly doubtful that Congress intended to deny an exemption from the wagering tax under the circumstances present in this case—when participation in the drawings is limited to members and the net profits derived from the drawings are applied in furtherance of the general purposes for which the organization is entitled to an exemption under section 501. Such an interpretation of the inurement clause in section 4421(2) (B) is supported by the numerous decisions and rulings construing the comparable clause contained in section 501(c) (7), which denies an exemption to a club if any "part of the net earnings of which inures to the benefit of any private shareholder." Two decisions in this circuit are particularly instructive: West Side Tennis Club v. Commissioner of Internal Revenue, 111 F.2d 6 (2d Cir.), cert. denied, 311 U.S. 674, 61 S.Ct. 40, 85 L.Ed. 434 (1940), and Jockey Club v. Helvering, 76 F.2d 597 (2d Cir. 1935). In *West Side Tennis Club* we held that the substantial income which the club derived from conducting annual national championship tennis matches inured to the benefit of its members. Although the club used the income from its public ticket sales for the general operation of the club, the court found that the net earnings inured to the benefit of members since without the tournaments "they would have had to pay larger dues or restrict club operations uncomfortably. . . ."[9] 111 F.2d at 8. Similarly, in *Jockey Club* we held that if a club engages in profitable transactions with the public over a substantial period of time the earnings so derived " 'inure to the benefit' of the

---

6. Finding of Fact 26.

7. Finding of Fact 36.

8. Finding of Fact 34.

9. For decisions apparently rejecting this view of inurement, see Santee Club v. White, 87 F.2d 5, 7 (1st Cir. 1936) ; Koon Kreek Klub v. Thomas, 108 F.2d 616, 618 (5th Cir. 1939).

members, though they are not distributed." 76 F.2d at 598.

In both *West Side Tennis Club* and *Jockey Club* substantial public participation in the club activity formed the basis for finding inurement.[10] The court in *West Side Tennis Club* was careful to remark:

> We do not suggest that the members might not conduct a profitable tournament which would have the effect of lowering their dues so long as the earnings from the tournament were not derived from the public.

111 F.2d at 8. The reason for finding inurement when the club derives profits from public involvement in its activities but not when it raises revenues from activities restricted to members is obvious. In the former case the public helps pay for the club's operations, a clear benefit to the private shareholder, while in the latter the members continue to bear all the costs of the club's operations, in the same way they do when paying dues. Congress added the restriction against inurement of profits to private members in part because "otherwise it would have been a simple matter to tack a profitable business on to a club that was having difficulty in carrying as large and luxurious a plant as the members might like without the payment of burdensome dues." West Side Tennis Club v. Commissioner, *supra*, 111 F.2d at 8.

■ To be sure, public participation is not the only test of inurement under section 501(c) (7). Even where net earnings are derived solely from member contributions the inurement clause in that section forbids distribution of dividends to members, such as death benefits. See, *e.g.*, Allied Trades Club, Inc. v. Commissioner of Internal Revenue, 23 T.C. 1017, 1020 (1955),

aff'd, 228 F.2d 906 (3d Cir. 1956) (*per curiam*). See also 6 Mertens, Law of Federal Income Taxation § 34.22, at 173 (1968). But, if the club's earnings are used to support the club's tax exempt operations, there is no inurement. And the fact that the club's net earnings were raised through profitable club activities rather than by dues is irrelevant. See Rev.Rul. 69–68, 1969–1 Cum. Bull. 153 (gaming devices); Rev. Rul. 44, 1953–1 Cum.Bull. 109 (bar and restaurant). The same rules, we believe, apply under the inurement clause in section 4421(2) (B).

■ The Government has urged us to interpret the inurement clause in section 4421(2) (B) differently. It maintains that even if drawings are restricted to members and the net proceeds used for the tax exempt purposes of the organization, we should find inurement if the drawings are "large scale" rather than "occasional programs." When drawings are frequently held, the Government argues, the members receive "direct and substantial benefits from the net proceeds of the lottery through reduced dues, low food and drink prices, and high quality services."[11] The Government concedes that its proposed construction of section 4421(2) (B) is contrary to the interpretation that has been given the inurement clause in section 501(c) (7). But it offers two reasons for construing the inurement clause in section 4421(2) (B) more strictly than its section 501(c) (7) counterpart. First, the Government contends that:

> If the two phrases were construed as meaning essentially the same thing, then the Section 4421(2) (B) prohibition against "inurement" would be redundant, because in the opening phrase of that Code section the "draw-

---

10. Not every instance of public participation in a club activity will result in a loss of exemption under section 501(c) (7):

> It is the view of a majority of the Courts that, for a social club to qualify for exemption under Section 501(c) (7), its outside profits must be (1) strictly incidental to club activities, not a result of an outside business, and (2) either negligible or non-recurring.

6 Mertens, Law of Federal Income Taxation § 34.22, at 172 (1968). *See, e. g.*, Santee Club v. White, 87 F.2d 5 (1st Cir. 1936); Scofield v. Corpus Christi Golf & Country Club, 127 F.2d 452 (5th Cir. 1942).

11. Government's Brief at 12.

ing" exception is described as applying only to income-tax exempt organizations—which organizations, by definition, are prohibited from having "net earnings" inure to members.[12]

The Government's second argument focuses on the alleged difference of meaning between "net earnings" in section 501(c) (7) and "net proceeds" in section 4421(2) (B). The former term, it claims, "implies technical accounting analysis" and "applies only to earnings from non-member sources." "Net proceeds," on the other hand, is a "simple, functional phrase describing what is left over from gross lottery proceeds after payment of winning tickets and the expenses of conducting the lottery," and covers earnings from both member and non-member sources. Thus, the Government concludes that section 4421(2) (B) contains "an additional and different inurement test" under which the proceeds of the club's lottery "inured" to the benefit of its membership within the meaning of the latter section.[13]

■ We are unpersuaded by the Government's analysis of the statute. It is difficult to see why the net proceeds of club drawings inure to private members when the drawings are held daily but not when held monthly or semi-annually. To make popularity of a club activity, which Congress intended to encourage by enacting both sections 501 and 4421(2) (B), the test for determining inurement would be a strange rule. Furthermore, we think a close reading of the statutory text refutes the Government's arguments. To interpret the two inurement clauses similarly does not necessarily imply redundancy in section 4421(2) (B). Plaintiff has suggested one plausible explanation for the repetition. Section 4421(2) (B) prohibits inurement to "any private shareholder *or individual*" (emphasis added), while section 501(c) (7) withdraws the exemption only when there is inurement to "any private shareholder." Since a cursory reading of the wagering tax statute

reveals that the thrust of the tax is directed at "illegal, organized gambling," Grosso v. United States, 390 U.S. 62, 74, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) (Brennan, J., concurring), Congress evidently thought it necessary to add the restriction against inurement to any "individual" to protect against involvement of professional gamblers in club activities. In doing so it may well have thought it both desirable and necessary to spell out the inurement prohibition in detail. In any event, the possibility that Congress may have needlessly repeated itself by adding the inurement clause in section 4421(2) (B) is insufficient reason in our view for concluding that Congress intended to depart from long-standing interpretations given the inurement language in another part of the Code. The better view is that if Congress had intended a substantially different inurement rule in section 4421(2) (B) it would have adopted language substantially different from that employed in section 501.

What we have just said, of course, applies with equal force to the Government's other textual argument. That argument is additionally defective, however, because it is based on the misapprehension that the section 501(c) (7) prohibition against inurement of "net earnings" applies only to "earnings from non-member sources." As we noted earlier in our discussion of section 501(c) (7), the clause contained in that section prohibits inurement of internally generated "net earnings" as well as profits from nonmember sources. See, *e. g.*, Allied Trades Clubs, Inc. v. Commissioner of Internal Revenue, 23 T.C. 1017, 1020 (1955), aff'd, 228 F.2d 906 (3d Cir. 1956) (*per curiam*). See also 6 Mertens, Law of Federal Income Taxation § 34.22, at 165 n. 54, 173 (1968). Thus, the distinction which the Government attempts to draw between the terms "net earnings" and "net proceeds" is not significant in this context.

---

12. *Id.* at 15.

13. *Id.*

Since we find ourselves in agreement with the district court's decision on the only issue before it—whether any part of the net proceeds from the drawings inured to the benefit of plaintiff's members—that would normally be the end of our responsibilities. The Government, however, has pressed upon us a new issue that it did not raise below. Although we are not required to consider its argument, we choose to do so in this case because of the need to clear up uncertainties in this area of the tax law.

The Government's new argument is that since section 4421(2) (B) provides that the term "lottery" does not include "any drawing" conducted by a section 501 organization,[14] that "clearly demonstrates that the term 'drawing' as used in . . . section [4421(2) (B)] was intended to have a meaning restricted so as to leave some lotteries conducted by such organizations subject to the wagering tax."[15] To determine whether a lottery is a "drawing" the Government says it is necessary to examine the " 'fundamental nature' of the activity, rather than the 'methods of play' . . . ."[16] The "fundamental nature" of a "drawing" within the meaning of section 4421(2) (B), according to the Government, includes characteristics found in the "occasional raffle" held for a worthy cause; where participants regard their purchase as a contribution, rather than a bet, and the winners receive token prizes. The Government contends that plaintiff's "lottery" was essentially different, a "large-scale, continuous, and long-standing lottery."[17]

Even if we ascribed the significance which the Government does to the appearance of the word "drawing" rather than the term "lottery" in section 4421(2) (B), we would reject the Government's grudgingly narrow interpretation of the exemption. The only support in the legislative history for this construction is the following ambiguous remark made by Congressman Reed during his explanation on the House floor of the wagering tax provisions in the Revenue Act of 1951: "Moreover, the bill exempts raffles such as are occasionally conducted by churches and veterans' organizations." 97 Cong.Rec. Part 5, p. 6896 (1951). At first blush the statement appears to provide a measure of support to the Government's position. But, the remark is of little help since we have no indication whether the Congressman was referring to drawings restricted to members or to drawings open to the public. If he was speaking of the latter, which seems to us the more likely possibility, our decision is entirely consistent with his statement. In any case, this inconclusive piece of legislative history would provide a scanty basis for so severely restricting the scope of the exemption.

Nor do the few decisions under section 4421(2) (B) support the Government's construction. As the Government itself candidly concedes, in every case where a court has held that the "lottery" conducted by an exempt organization did not qualify as a "drawing" under section 4421(2) (B), the lotteries were "operated by professionals and tickets were widely sold to the general public."[18] See, e. g., Edgewood American Legion Post No. 448 v. United States, 246 F.2d 1 (7th Cir. 1957), cert. denied, 355 U.S. 926, 78 S.Ct. 383 2 L.Ed.2d 357 (1958); Woodard v. Campbell, 134 F.Supp. 258 (S.D.Ind. 1955), aff'd on other grounds, 235 F.2d

---

14. The relevant portion of section 4421 reads as follows:

    (2) Lottery.—The term "lottery" includes the numbers game, policy, and similar types of wagering. The term does not include—

       *      *      *      *      *

    (B) any drawing conducted by an organization exempt from tax under sections 501 and 521, if no part of the net proceeds derived from such drawing inures to the benefit of any private shareholder or individual.

    26 U.S.C. § 4421.

15. Government's Brief at 9.

16. Id.

17. Id. at 12.

18. Id. at 10 n. 9.

268 (7th Cir. 1956). Those decisions have no application here.

In conclusion we note that allowing Rochester Liederkranz an exemption from the wagering tax will not permit commercial gambling operations to conduct their activities tax free. To qualify for an exemption under section 4421(2) (B) the organization must meet all the requirements of section 501. If a club becomes merely a subterfuge for a "private" gambling casino, where the proceeds are not used for the purposes recognized under section 501, then the organization would not be entitled to an exemption under that section, and consequently would not fulfill the primary condition of section 4421(2) (B). In short, our decision today is not inconsistent with the intent of Congress to make commercial gambling operations pay their share of the nation's taxes.

Judgment affirmed.