SANTA BARBARA CLUB, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8544–74. Filed May 23, 1977.

*Gerald S. Thede, Carl A. Stutsman, Jr., Terry John Connery,* and *Jack R. White,* for the petitioner.
*David Roth,* for the respondent.

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Income tax |
|------|------------|
| 1969 | $774 |
| 1970 | 912 |
| 1971 | 743 |

The sole issue for our consideration is whether a social club's status as a tax-exempt organization under section 501(c)(7)[1] can be revoked because the club sold liquor to its members for consumption away from the club's premises.

---

[1] All references are to the Internal Revenue Code of 1954 as amended and in effect from time to time during the years in issue.

## FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by reference.

The Santa Barbara Club (hereinafter petitioner or the club) is a nonprofit corporation organized in 1894 and existing under the laws of the State of California with its principal place of business in Santa Barbara, Calif., at the time of the filing of the petition herein. It filed its Federal corporate income tax returns for the years in question with the Internal Revenue Service Center at Fresno, Calif.

Petitioner is a social club organized solely for the entertainment and diversion of its members. Its primary function is to provide downtown facilities for members and their guests. It is also used for approximately 15 social events each year. Among the services provided are the serving of food and liquor for consumption on the premises of the club, the sale of package liquor for consumption off the premises, and the sale of tobacco products for consumption on or off the premises. It is open only to members (and guests accompanied by a member) and the services listed above, including the sale of package liquor, are provided solely to such persons.

For approximately 40 years, petitioner has sold alcoholic beverages for consumption both on and off its premises.[2] Package liquor could be purchased only from the club's general manager or his secretary and could not be consumed at the club. Usually a member desiring to purchase package liquor would place his order with the general manager or his secretary and the member would take the liquor with him as he left the club. Occasionally, an order would be placed over the telephone, in which case the club would deliver the liquor to the member's home.

The package liquor sold by the club consisted of both "name brands" and "club brands." "Name brand" liquor was sold under the label of individual distillers. Club brands were standard brands of bourbon, scotch, vodka, and gin sold under the label of the club. Prices of the name brand liquor were the minimum retail price permitted by the California Fair Trades

---

[2] Since 1936, petitioner has had both an on-sale and off-sale liquor license issued by the State of California.

Act for such brands. Club label liquor was priced at 12 to 15 percent above its wholesale cost, which was somewhat cheaper than the price charged for the same liquor sold under the label of its distillery. Sales of club label liquor accounted for between 75 and 80 percent of the package liquor sold. Other clubs in southern California employed similar procedures for selling package liquor to their members.

Club members were charged for food served in the dining room, liquor sold by the drink at the bar, tobacco and package liquor sold at the club, and the special social events held each year. For the years in question, the sales, gross income, and net income from the sale of package liquor and other activities were as follows:

| Year | | Package liquor | Other activities | Total |
|---|---|---|---|---|
| 1969: | Sales | $27,955.65 | $27,851.22 | $55,806.87 |
| | Gross income | 4,515.91 | 15,104.50 | 19,620.41 |
| | Net income | 4,060.95 | (10,505.69) | (6,444.74) |
| 1970: | Sales | 29,314.00 | 27,642.00 | 56,956.00 |
| | Gross income | 4,708.00 | 15,132.00 | 19,840.00 |
| | Net income | 4,165.00 | (10,635.00) | (6,470.00) |
| 1971: | Sales | 29,444.00 | 26,379.00 | 55,823.00 |
| | Gross income | 4,833.00 | 14,303.00 | 19,136.00 |
| | Net income | 4,255.00 | (11,486.00) | (7,231.00) |

In addition to sales income, petitioner had the following amounts of membership income, rental income, and interest in 1969, 1970, and 1971:

| Year | Membership income | Rental income[3] | Interest[3] |
|---|---|---|---|
| 1969 | $43,920 | $840 | $3,199.23 |
| 1970 | 49,593 | 1,050 | 4,044.00 |
| 1971 | 46,617 | 1,080 | 3,378.00 |

By letter dated January 15, 1943, respondent determined that petitioner was exempt from Federal income taxes under the provisions of section 101(9) of the Internal Revenue Code of 1939, now section 501(c)(7) of the Internal Revenue Code of 1954. Respondent revoked petitioner's tax-exempt status, effective as of January 1, 1969, in a ruling dated September 6, 1972, on the ground that petitioner "derived a substantial

---

[3] The parties are in agreement that rental and interest income constitute unrelated business income for 1970 and 1971. See sec. 512.

amount of income from the sale of liquor by the package to [its] members for off-premises consumption."

### · OPINION

Among organizations granted an exemption from the general provisions of the income tax are social clubs, which are defined in section 501(c)(7) as "Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder."[4] The question before us is the extent to which petitioner should be deprived of the benefits of this provision.

Initially, we think it important to emphasize what is not in issue. Although the club realized a profit from the liquor sales in question, which was utilized to offset operating expenses, respondent has not argued that such profits "inure[d] to the benefit of" the club's members in violation of the latter part of section 501(c)(7).[5] Moreover, respondent has specifically renounced, at least for the purposes of decision herein, any contention that such profit constituted "unrelated business income" for the taxable years 1970 and 1971 within the meaning of section 512(c); under such circumstances, we will not consider whether petitioner should in any event be subject to tax on the income from its bottled liquor sales under section 511.[6]

Clearly, the bottled liquor sales were an ongoing and recurring operation of the club and petitioner does not contend otherwise. Nor is there any dispute between the parties that the major, or even predominant, purpose of the club's existence was, and continued to be, during the taxable years in issue, the carrying on of social and recreational activities through the commingling of its members. Similarly,

---

[4] A corporate exemption has been in the Code since 1916. For a thorough review of the legislative antecedents of sec. 501(c)(7) and subsequent related legislative action, see *United States v. Fort Worth Club,* 345 F.2d 52 (5th Cir. 1965).

[5] Nor has respondent advanced any "inurement" argument based upon the sale of club brands of liquor at less than the cost of standard brands. See p. 201 *supra.*

[6] We express no opinion as to whether a decision for petitioner herein will preclude respondent from issuing a further deficiency notice in respect of any such tax. Compare sec. 6211(a) and 6212(a) and (c) with *Crowell-Collier Pub. Co. v. Commissioner,* 259 F.2d 860, 864 (2d Cir. 1958), and *Rowan Cotton Mills Co. v. Commissioner,* 140 F.2d 277 (4th Cir. 1944), affg. on this issue 1 T.C. 865 (1943).

we are not confronted with the problem of income derived from "outsiders"—a problem with which the courts and the Congress have had to struggle over the years. See, e.g., *Pittsburgh Press Club v. United States*, 536 F.2d 572 (3d Cir. 1976); *United States v. Fort Worth Club*, 345 F.2d 52 (5th Cir. 1965); S. Rept. No. 94–1318 (1976), 1976–2 C.B. 597.

We now turn to the narrow issue which we must resolve, namely, whether petitioner should be deprived of its exemption because of its sales of bottled liquor to its members for consumption away from its premises. We approach its resolution mindful of two general principles which have been applied in this area and which to some degree are in conflict: (1) Although the statute uses the word "exclusively," case law and respondent's regulations have abjured a literal application and permitted nonexempt activity of an insubstantial, though recurring, nature (see *Pittsburgh Press Club v. United States, supra;* see and compare *Aviation Club of Utah v. Commissioner*, 162 F.2d 984 (10th Cir. 1947), affg. 7 T.C. 377 (1946), with *Aviation Country Club, Inc. v. Commissioner*, 21 T.C. 807 (1954)); and (2) where an exemption is designed to facilitate private activities rather than public goals, any doubts as to proper construction should be resolved in favor of the Government (see *The Associates v. Commissioner*, 28 B.T.A. 521, 524 (1933)). The issue is not without its difficulties both conceptually and pragmatically and unfortunately we do not have the benefit of any conclusive guidance from the applicable statutory provisions, legislative history, or the decided cases.

In Rev. Rul. 44, 1953–1 C.B. 109, respondent ruled that a social club did not forfeit its exemption because it derived its principal income from the operation of a bar or restaurant used only by members and their guests. In so ruling, respondent stated, "Exemption has been granted * * * to many clubs where considerable revenue was derived from the sale of merchandise and services to the members, but such exemption has been denied where substantial revenue was derived from dealings with nonmembers." Since 1958, section 1.501(c)(7)–1(a), Income Tax Regs., has provided that "a club otherwise entitled to exemption will not be disqualified because it raises revenue from members through the use of club facilities or in connection with club activities." Petitioner

relies heavily on this language and the administrative practice adverted to, coupled with legislative reenactment of the language contained in section 501(c)(7), to support its position that Rev. Rul. 68–535, 1968–2 C.B. 219, in which respondent specifically ruled that, effective January 1, 1969, a club which sold bottled liquor to members only for off-premises consumption was not operated exclusively for the purposes prescribed by section 501(c)(7), is an unwarranted interpretation of that statutory provision.

Essentially, petitioner contends that, since the activity in question was confined to members, its exempt status should be unaffected. In so arguing, petitioner points to language in *McGlotten v. Connally*, 338 F.Supp. 448 (D. D.C. 1972), and *Rochester Liederkranz, Inc. v. United States*, 456 F.2d 152 (2d Cir. 1972), to the effect that revenue arising from activities restricted to members should not serve as the basis for removing the exemption of a social club. But, it is clear that limiting activities to members is not enough in and of itself. Thus, in *Allied Trades Club, Inc. v. Commissioner*, 23 T.C. 1017 (1955), affd. per curiam 228 F.2d 906 (3d Cir. 1956), we held that the operation of a death-benefits fund for members caused a social club to lose its exempt status on the ground that such activity "could not be classified as an operation for pleasure, recreation or social purposes" (see 23 T.C. at 1019). And in *McGlotten v. Connally, supra*, the court stated that "any 'profit' which results from overcharging *for the use of the facilities* still belongs to the same members."[7] 338 F.Supp. at 458 (emphasis added). In a similar vein, the legislative observation in H. Rept. No. 91–413 (1969), 1969–3 C.B. 200, 231, that the exemption was designed to place the members in "substantially the same position as if [they] had spent [their] income on pleasure or recreation without the intervening separate organization" does not in our opinion bless every

---

[7] *Rochester Liederkranz, Inc. v. United States*, 456 F.2d 152 (2d Cir. 1972), involved the issue of "inurement"—an issue which is not before us herein—and the language of the Court of Appeals regarding the derivation of earnings from members was made in the context of that issue. See 456 F.2d at 156. We recognize that *Allied Trades Club, Inc. v. Commissioner*, 23 T.C. 1017 (1955), affd. per curiam 228 F.2d 966 (3d Cir. 1956), also dealt with the increment issue but did so only as an additional ground for decision.

instance in which members of a social club "wash each other's linen."

Respondent's main contention is that the absence of the element of commingling, as set forth in Rev. Rul. 68–535, *supra,* is determinative. While we are not prepared to accept such an absolute standard,[8] it cannot be gainsaid that commingling is an important consideration. See *Chattanooga Auto. Club v. Commissioner,* 182 F.2d 551, 554 (6th Cir. 1950); *Augusta Golf Assn. v. United States,* 338 F.Supp. 272, 278 (S.D. Ga. 1971).

The liquor sales involved herein did not involve commingling to any significant extent. Nor did the sales further any other exempt purpose. Under these circumstances and the further fact that the liquor sales were recurring, they will destroy the exemption if such activity is substantial and not negligible in nature. See *United States v. Fort Worth Club, supra.*

For taxable years beginning prior to January 1, 1970, social clubs were not subject to the tax on unrelated business income under section 511. It has been held that for such years the amount of outside income which a club could receive without losing its exemption was strictly limited in order not to confer upon social clubs greater benefits than were granted to organizations subject to the unrelated business tax. *United States v. Fort Worth Club, supra; Coastal Club, Inc. v. Commissioner,* 43 T.C. 783, 805–806 (1965), affd. per curiam 368 F.2d 231 (5th Cir. 1966).

The Tax Reform Act of 1969 (Pub. L. 91–172, 83 Stat. 487) subjected social clubs to the tax on unrelated business income for taxable years beginning after December 31, 1969. However, both legislative committees stated, in the course of considering the applicable legislation, that it was not their intention to change the test for determining whether nonexempt activities were sufficient to require that the social club should lose its exemption. S. Rept. No. 91–552 (1969), 1969–3 C.B. 423, 471; Conf. Rept. No. 91–782 (1969), 1969–3 C.B. 644, 652. This legislative history strongly suggests that the pre-

---

[8] Respondent himself has recognized that commingling in every aspect of a social club's activity is not essential. See Rev. Rul. 74–30, 1974–1 C.B. 137.

1969 standard be applied for the taxable years 1970 and 1971 as well.[9]

In each of the years involved herein, the dollar volume from the sale of bottled liquor for off-premises consumption was substantial (in excess of 25 percent of the petitioner's gross receipts from all sources), and the gross income (i.e., gross profit) derived from this service to members was not insignificant (in excess of 7 percent of petitioner's gross income from all sources). In the light of petitioner's both ongoing and recurring sales of bottled liquor and the sizable percentages of gross receipts and gross income which such sales represent, we conclude that petitioner is not entitled to an exemption under section 501(c)(7) in any of the years in issue. In so concluding, we are not unmindful that, prior to the issuance of Rev. Rul. 68–535, *supra,* respondent apparently issued rulings in the disputed area recognizing that other social clubs conducting the activity involved herein were nevertheless entitled to exemption under section 501(c)(7). But the record herein is not sufficient to furnish a foundation for decision based upon a contemporaneous interpretation of the applicable statute by the agency charged with its administration. Cf. *Hanover Bank v. Commissioner,* 369 U.S. 672 (1962). Indeed, we are inclined to the view that the instant case fits the mold of those cases which accord considerable latitude to respondent in terms of changing his position (if, indeed, he did so change herein).[10] See *Automobile*

---

[9] By Pub. L. 94–568, 90 Stat. 2697, sec. 501(c)(7) was amended to read:

(7) Clubs organized for pleasure, recreation, and other nonprofitable purposes, substantially all of the activities of which are for such purposes and no part of the net earnings of which inures to the benefit of any private shareholder.

The legislative history reveals that Congress believed that by making social clubs subject to the unrelated business tax, it was no longer necessary to severely limit the amount of outside income that such a club could receive without losing its tax exemption. Although the reports of both the House Committee on Ways and Means and the Senate Committee on Finance indicate that this measure was designed to serve as a clarification of existing law (H. Rept. No. 94–1353, 1–5 (1976); S. Rept. No. 94–1318, 1–5, 8 (1976), 1976–2 C.B. 597–601, the act is effective only for taxable years beginning after Oct. 20, 1976. Pub. L. 94–568, sec. 1(d). Consequently, we see no basis for utilizing this provision or its legislative history in determining petitioner's status during the taxable years before us in any manner.

[10] Rev. Rul. 44, 1953–1 C.B. 109, and Rev. Rul. 68–535, 1968–2 C.B. 219, are not necessarily inconsistent, nor does sec. 1.501(c)(7), Income Tax Regs., necessarily permit unrestricted dealings with members.

*Club of Michigan v. Commissioner*, 353 U.S. 180 (1957); *United States v. Leslie Salt Co.*, 350 U.S. 383 (1956).

                       *Decision will be entered for the respondent.*

Reviewed by the Court.

DRENNEN, *J.*, did not participate in the consideration and disposition of this case.

SIMPSON, *J.*, dissenting: Here we have the question of whether a social club is entitled to exemption from the Federal income tax, and to answer that question, we are required to interpret and apply a number of "slippery" concepts, such as, what activities entitle a club to exemption, to what extent may a club engage in nonexempt activities and still retain its exemption, what is the effect of a club engaging in activities for profit either with its own members or with the public, and what is the effect of a club engaging in competition with commercial businesses. In our system of Government, Congress is given the legislative power, which includes the authority and responsibility for laying down the general policies as to what organizations are entitled to exemption and the particular conditions which must be satisfied by them. When a dispute develops, it becomes our responsibility to apply those general policies to the particular facts of the case before us, but our ultimate objective in deciding the case must be to attempt to achieve the result intended by the Congress. In my opinion, the Court, in this case, has lost sight of that ultimate objective and reached a result inconsistent with the policy guidelines laid down by the Congress. For that reason, I must dissent.

Before 1976, section 501(c)(7) and its predecessors provided that for a social club to be exempt, it must be "organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes." In deciding what activities may be the basis for granting exemption, it has been held that activities for pleasure or recreation which involve the commingling of the members of the club may qualify. See *Chattanooga Automobile Club v. Commissioner*, 182 F.2d 551, 554 (6th Cir. 1950), affg. 12 T.C. 967 (1949); *Keystone Automobile Club v. Commissioner*, 181 F.2d 402, 404 (3d Cir. 1950), affg. 12 T.C. 1038 (1949); *Augusta Golf Association v.*

*United States,* 338 F.Supp. 272, 276–278 (S.D. Ga. 1971); Rev. Rul. 74–148, 1974–1 C.B. 138; Rev. Rul. 74–30, 1974–1 C.B. 137. Thus, such activities may be identified as "exempt activities."

Throughout the history of the income tax, there has been difficulty in deciding upon the proper mix between the exempt and nonexempt activities to be maintained by an exempt club. Although a literal reading of the statute would have required a holding that engaging in any nonexempt activities would cause a club to lose its exemption, the courts have never gone that far. E.g., *Scofield v. Corpus Christi Golf & Country Club,* 127 F.2d 452 (5th Cir. 1942); *Koon Kreek Klub v. Thomas,* 108 F.2d 616 (5th Cir. 1939); *Aviation Country Club, Inc. v. Commissioner,* 21 T.C. 807 (1954); cf. *Pittsburgh Press Club v. United States,* 536 F.2d 572 (3d Cir. 1976). In all those cases, a club has been permitted to engage in some nonexempt activities and still retain its exemption, but the courts have had a great deal of difficulty in deciding precisely the standard to be applied in judging the extent to which an exempt club may engage in nonexempt activities. For example, in *United States v. Fort Worth Club of Fort Worth, Texas,* 345 F.2d 52, 57 (5th Cir. 1965), the court declared:

for a social club to qualify for exemption under section 501(c)(7), its outside profits must be (1) strictly incidental to club activities, not a result of an outside business, and (2) either negligible or nonrecurring. * * * [Fn. ref. omitted.]

But elsewhere in the same opinion, the court said:

The Fort Worth Club cannot deny that it has derived *substantial* and *recurrent* profit from a business altogether unrelated to its activities as a social club. [345 F.2d at 57; emphasis supplied.]

In fact, the club derived more than half of its gross receipts from rental of a building owned by it. In *Aviation Country Club, Inc. v. Commissioner, supra,* a club which derived from 20 to 25 percent of its gross income from nonmembers was found to be tax exempt. The Court of Appeals for the Third Circuit has held that where a club derived from 11 to 17 percent of its gross receipts from nonmember sources, such amount was not so substantial that, as a matter of law, the club was not operated exclusively for exempt purposes within the meaning of section 501(c)(7). *Pittsburgh Press Club v.*

*United States, supra* at 575. Other cases have prohibited substantial business dealings *with the public,* because otherwise it would be "a simple matter to tack a profitable business on to a club that was having difficulty in carrying as large and luxurious a plant as the members might like without the payment of burdensome dues." *West Side Tennis Club v. Commissioner,* 111 F.2d 6, 8 (2d Cir. 1940), affg. 39 B.T.A. 149 (1939), cert. denied 311 U.S. 674 (1940); see also *United States v. Fort Worth Club of Fort Worth, Texas, supra* at 57; *Jockey Club v. Helvering,* 76 F.2d 597, 598 (2d Cir. 1935), affg. per curiam 30 B.T.A. 670 (1934); *Augusta Golf Association v. United States,* 338 F.Supp. at 275.

In the past 8 years, Congress has twice considered the subject of the business activities of social clubs. In 1969, the Finance Committee declared:

> In recent years, many of the exempt organizations not now subject to the unrelated business income tax—such as churches, *social clubs,* fraternal beneficiary societies, etc.—have begun to engage *in substantial commercial activity.* * * * it is difficult to justify taxing a university or hospital which runs a public restaurant or hotel or other business and not tax a *country club* or lodge engaged in similar activity. [S. Rept. No. 91–552 (1969), 1969–3 C.B. 423, 467; emphasis supplied.]

See also H. Rept. No. 91–413, (Part 1, 1969), 1969–3 C.B. 200, 230. In such statement, Congress recognized that business activities of social clubs were exceeding the standard laid down in the *Fort Worth Club* case; that is, such business activities were more than "strictly incidental" or "negligible or non-recurring." Nevertheless, Congress did not propose to withdraw the exemption from the social clubs because of such business activities; instead, it merely decided to impose the unrelated business tax on the income derived from the business activities. Had the clubs been engaged merely in "strictly incidental" or "negligible or non-recurring" business activities, there would have been little reason to tax such activities, but because they had become substantial, Congress concluded that they should be taxable. Cf. *Pittsburgh Press Club v. United States,* 536 F.2d at 579 n. 9. In addition, the conference report stated:

> The fact that an unrelated business income tax is payable by an organization is not intended to mean that the organization should, or should not, retain its exemption. This is to be determined on the basis of the

organization's overall activities without regard to the fact that some of its activities are subject to the unrelated business income tax. [Conf. Rept. No. 91–782 (1969), 1969–3 C.B. 644, 652.]

In 1976, Congress decided to amend the statute to provide that a social club was entitled to exemption so long as "substantially all" of its activities were exempt activities.[1] Pub. L. 94–568, 90 Stat. 2697. In connection with that change, Congress again recognized that social clubs were engaged to a substantial extent in nonexempt activities. Although the amendment was made applicable only to taxable years beginning after 1976, Congress declared that the change in the statute did not make a change in the law, but merely clarified the law. S. Rept. No. 94–1318 (1976), 1976–2 C.B. 597–598.

In connection with the 1976 amendment, the committees concerned with the legislation set forth their understanding of how the law is to be applied. The committee reports establish guidelines pursuant to which social clubs are permitted to receive up to 35 percent of their gross receipts, including investment income, from nonmember sources. Within this 35-percent amount, not more than 15 percent of the gross receipts may be derived from the use of a social club's facilities or services by the general public. If a club's outside income is within the guidelines, its exempt status will not be lost on account of nonmember income; however, if a club earns more than is permitted under the new guidelines, a decision as to whether substantially all of its activities are related to its exempt purpose will continue to be based upon all of the facts and circumstances. S. Rept. No. 94–1318 (1976), 1976–2 C.B. 597, 599; H. Rept. No. 94–1353, to accompany H.R. 1144 (Pub. L. 94–568), 4–5 (1976).

In summary, an examination of the legislative history surrounding the 1969 and 1976 amendments reveals clearly that Congress understood that social clubs were engaging in nonexempt activities to a substantial extent, and the only congressional response thereto was the decision to impose a tax upon the unrelated business income of such clubs. A

---

[1] A similar change was approved by the Ways and Means Committee in 1972, but Congress took no further action with respect to such legislation. See H.R. 11200, 92d Cong., 2d Sess., 118 Cong. Rec. 8752 (1972); H. Rept. No. 92–929, to accompany H.R. 11200 (1972).

reading of the statute and the decisions interpreting it leaves one with uncertainty as to the standard to be applied, and Congress has undertaken to clarify the law and to set forth the standards it considers appropriate. In a number of cases, the Supreme Court has recognized the wisdom of considering any relevant legislative history in interpreting a statute, even congressional declarations which occurred subsequent to the enactment of the legislation. *Glidden Co. v. Zdanok,* 370 U.S. 530, 541 (1962); *Massey Motors v. United States,* 364 U.S. 92, 102 (1960); *Commissioner v. Estate of Holmes,* 326 U.S. 480, 488 (1946); *Helvering v. Weaver Co.,* 305 U.S. 293, 296 (1938). When, as here, we have a vague standard to be applied and Congress has indicated how it believes the standard should be applied, the course of judicial wisdom and responsibility calls for us to accept and follow those congressional guidelines.

Moreover, in deciding a case involving the business activities of a social club in 1977 or subsequently, the congressional guidelines will surely be given great weight. Congress made clear that in making the changes in the statute, it did not intend to change the law but merely clarify it. Under such circumstances, there is no compelling reason to apply the guidelines only prospectively; accordingly, in my opinion, we should make use of them in deciding the controversy before us.

Though the guidelines are helpful, they cannot be applied mechanically in this case. They establish a limit of 15 percent on gross receipts derived from the use of facilities or services by nonmembers and a limit of 35 percent on the total amount of receipts from nonmembers. If the receipts from the nonexempt activities in this case are compared with all receipts by the club, the nonexempt activities represent approximately 25 percent of the total activities. Such nonexempt activities come within the 35-percent limitation. Although the nonexempt activities in this case involve sales for profit, such business was not carried on with members of the public; thus, this is not a situation in which profits from dealings with the public are being used to subsidize the activities for members. Compare *West Side Tennis Club v. Commissioner,* 111 F.2d at 8. For that reason, it seems that the 15-percent limit should not be applicable. Twenty-five percent may represent the outer limit on the extent to which

an exempt club may engage in such activities for profit, but in my opinion, we cannot say that 25 percent exceeds the permitted limit on such activities. Accordingly, I would hold that this club is entitled to exemption for each of the years at issue. I am confident that such a result is consistent with what Congress has done and said in the past 8 years.