AFRO-AMERICAN PURCHASING CENTER, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Afro-American Purchasing Center, Inc. v. Commissioner
Docket No. 7769-72
United States Tax Court
T.C. Memo 1978-31; 1978 Tax Ct. Memo LEXIS 481; 37 T.C.M. (CCH) 184; T.C.M. (RIA) 780031; January 25, 1978, Filed Benjamin D. Fein and Eugene L. Vogel, for the petitioner. David A. Schmudde, for the respondent. TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioner's United States corporation income tax and additions to tax: Addition to tax TYE
Deficiency
Sec. 6651(a) [1]
June 30, 1967
$19,819.16
$4,954.79
June 30, 1969
2,777.16
694.29
June 30, 1970
21,496.92
5,374.23
Because of concessions made by respondent, the sole issue for decision is whether petitioner is entitled to an exemption from taxation under section 501 as a corporation organized and operated exclusively for educational and/or charitable purposes during its fiscal years 1969 and 1970. All of the facts have been stipulated and the stipulation, including *483 the exhibits attached thereto, are incorporated herein by this reference. Petitioner, Afro-American Purchasing Center, Inc. (hereinafter petitioner or AAPC), is a nonprofit corporation organized in 1964 and existing under the laws of the State of New York with its principal place of business in New York, New York, at the time of the filing of the petition herein. It filed information returns for the years in question with the district director of internal revenue, New York, New York. In 1963, the United States Agency for International Development (AID) determined that inadequate training of procurement officials in countries receiving AID assistance hindered the progress of AID financed projects and necessitated waivers of AID requirements that assistance funds be used to purchase goods manufactured in the United States. AID decided that a program should be established that would assist recipient nations in satisfying their procurement needs in United States markets and would educate officials of such nations in procurement methods. Based upon a study prepared by Ohio State University, it was decided that a new corporation should be formed to carry out this program. AID thereupon *484 caused AAPC to be formed, named its initial board of directors and worked closely in planning AAPC's operations. In addition, during petitioner's fiscal years 1966 and 1967, AID made grants to AAPC totaling $170,000, to help establish AAPC and to enable it to commence its activities. Petitioner's Certificate of Incorporation provides: The purpose for which the Corporation is formed is: To establish, assist, aid and encourage the maintenance and improvement of educational and training facilities to develop the abilities, skills and techniques of African nationals or residents, including personnel of African governments, in the methods, procedures and sources of supply for world-wide purchasing, procurement, supply management and supply operations. The certificate further provides that no one is to receive any pecuniary profit from petitioner's operations (excepting reasonable compensation for services rendered to AAPC); that no part of petitioner's net earnings is to inure to any private member or individual; that no substantial part of petitioner's activities is to consist of attempting to influence legislation; that petitioner is not to participate in any political campaign *485 on behalf of any candidates for public office; and that all of petitioner's assets will be distributed to an organization described in section 501(c)(3) upon petitioner's dissolution. The parties have stipulated that petitioner implemented the foregoing provisions by operating in the following fashion and with the consequences indicated: 5. AAPC performs various educational functions and conducts several different programs designed to meet its educational purposes. (a) AAPC conducts a formal, structured eightmonth educational training program wherein the student-trainees are usually selected by the AID Office of Internal Training on the recommendation of their respective foreign governments. Occasionally, trainees are accepted to participate in this program upon the recommendation of other governmental or quasi-governmental agencies such as the United Nations, Branch for Training and Fellowships. (b) After selection, trainees participate in a one-week orientation program in Washington, conducted by the AID Office of Internal Training where representatives of AAPC are generally present. (c) Next, the trainees are assigned to formal classroom training at Fordham University *486 for a special academic program designed and developed by AAPC, AID and Fordham to meet the objectives of AAPC. AAPC generally monitors all stages of the formal classroom work, specifies the subject matter of the training courses, approves the professors, and discusses the curriculum to be covered with the professors during the training program. (d) In this phase, students cover such subjects as International Trade Relations and Procedures, Inventory Control, Supply Management and Purchasing Functions, including negotiation techniques and contract administration. (e) Although some of the courses and material presented in the special Fordham program is available to full time matriculated students, none is available to nonmatriculated students not enrolled on a regular basis at that university other that AAPC trainees. (f) Many of the courses and material presented in the Fordham program were specially designed and are only available to AAPC trainees. Moreover, onlyAAPC trainees are eligible to enroll and participate in this special program as such. (g) Upon the conclusion of this course, the trainees are directly assigned to AAPC where they are thoroughly tested by AAPC *487 to insure their understanding of the formal instruction and are prepared to begin on-the-job training. When necessary, special tutoring is arranged by AAPC's instructor staff. (h) The trainees are then assigned to work on a simulated purchasing exercise wherein they are responsible to do all the work (make analysis, review specifications, prepare sample bids, obtain quotations from manufacturers, and inquire about shipping and payment arrangements) in connection with a procurement implementation project that had already been carried out by AAPC. (i) The students are next assigned to work with AAPC staff members on all stages of an actual procurement cycle. The students, under the guidance of AAPC's staff, handle all facets of the purchasing cycle from the preparation of specifications to the payment of invoices. (j) During the on-the-job training period, conferences are conducted by AAPC specialists and various experts from American industry and universities. Visits to purchasing departments of various companies in the United States, as well as with financial and freight forwarding company representatives, are arranged. (k) In addition to the formal eight-month educational *488 program, AAPC also designs and administers special programs designed to meet the educational needs of certain less-developed nations in particular circumstances, usually at the request of the United States Government. Examples of such special programs include: (i) programs for architects and contractors of schools and public buildings from underdeveloped nations; (ii) seminars and discussion groups for groups ranging from dock superintendents to commercial delegations who desire to compare various commercial methods; and (iii) education of local maintenance people in the underdeveloped nations relating to the care and maintenance of the materials and supplies procured by AAPC. (1) From time to time, AAPC has hosted high officials from various African underdeveloped nations and has established special one-month courses for them to acquaint them with AAPC's program. 6. During the years here in question, more than 80% of the salaries paid by AAPC are paid to individuals directly involved with the educational purposes of, and the educational program conducted by, AAPC. All of such individuals do not spend 100% of their time on such matters. 7. During the years here in *489 question, approximately 25% of the time of AAPC's staff was spent in direct contact with trainees in connection with actual on-the-job training. 8. Actual procurement activity is essential to the successful achievement of AAPC's educational purposes and to the viability of its entire educational and training program. 9. AAPC's procurement activities also result in the support of other essential services and policies of the United States Government, the burden of which would otherwise fall on the United States Government and its agencies. (a) Virtually all of AAPC's procurement activities are in connection with AID-financed foreign origin procurement. (b) AAPC provides an alternative non-governmental procurement organization to the United States General Services Administration ("GSA") capable of effectively handling AID-financed foreign origin procurement at the lowest cost. (c) AAPC encourages and facilitates purchases of domestic goods by foreign nations. (d) AAPC lessens the burden of foreign governments, charitable organizations and, on occasion, has assisted Embassies of the United States Government, by more efficiently utilizing funds appropriated by the United *490 States. 10. AAPC procurement activities at no time was operated in the same manner as a commercial, profitseeking corporation in that: (a) AAPC purchases only for governments, quasi-government agencies and certain non-profit charitable institutions (such as the Peace Corps and certain foreign universities); (b) AAPC has not, does not, and pursuant to a resolution adopted by the board of directors will not, purchase for private commercial interests, domestic or foreign; (c) The procurement fee scales charges by AAPC are substantially lower than those charged by commercial enterprises that are comparable and by GSA; (d) The salaries paid to employees of AAPC are reasonable for non-profit organizations. (e) AAPC does not, and does not plan to, solicit business, advertise in any commercial media or employ any public relations officer. The question to be resolved herein is whether, during its fiscal years 1969 and 1970, petitioner qualified as an organization exempt from tax under section 501(c)(3). Respondent concedes that to the extent of its educational activities, petitioner was organized and operated for an exempt purpose and has stipulated that "[Actual] procurement *491 activity is essential to the successful achievement of AAPC's educational purposes and to the viability of its entire educational and training program." See p.7, supra. Essentially, respondent's position is that procurement activity is not usually an exempt function and that petitioner's procurement activity was the primary purpose of its operations, thereby depriving petitioner of its exempt status. In other words, respondent contends that a non-exempt tail was wagging an otherwise exempt animal. Petitioner counters with the assertion that its procurement activity was an integral and essential part of its educational program and that, however such type of activity may be characterized in another context, it does not affect petitioner's exempt status -- in short, the procurement activity functioned as the normal appendage to an exempt animal. Alternatively, petitioner argues that, under the circumstances herein, its procurement activity in and of itself constituted an exempt function on the ground that it lessened the burdens of government. We address ourselves first to the main point of contention between the parties, namely, the role of petitioner's procurement activities *492 in relation to its concededly exempt educational purposes. In so doing, we have been handicapped by petitioner's attempt to seek refuge in the stipulated facts and respondent's complacent reliance on the fact that the burden of proof is on the petitioner. The consequence of this procedural scenario is that we must reach our decision without the benefit that might have flowed from testimony as to the details of petitioner's operations -- particularly its procurement activities during the years in issue. We have done the best we can with the limited record before us and concluded that, on balance, petitioner has carried its burden of proving (see Rule 142, Tax Court Rules of Practice and Procedure) that the conduct of its procurement activities was not its primary purpose and that accordingly it should prevail. [2]
*493 Section 1.501(c)(3)-1(e)(1), Income Tax Regs., provides that an organization otherwise satisfying the requirements of section 501(c)(3) will not be denied an exemption where "it operates a trade or business as a substantial part of its activities, if the operation of such trade or business is in furtherance of the organization's exempt purpose or purposes and if the organization is not organized or operated for the primary purpose of carrying on an unrelated trade or business, as defined in section 513." The pertinent regulations under section 513 are contained in section 1.513-1(d) as follows: (2) Type of relationship required. Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of section 513, only if the causal relationship is a substantial *494 one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes. Where the production or distribution of the goods or the performance of the services does not contribute importantly to the accomplishment of the exempt purposes of an organization, the income from the sale of the goods or the performance of the services does not derive from the conduct of related trade or business. Whether activities productive of gross income contribute importantly to the accomplishment of any purpose for which an organization is granted exemption depends in each case upon the facts and circumstances involved.
(3) Size and extent of activities. In determining whether activities contribute importantly to the accomplishment of an exempt purpose, the size and extent of the activities involved must be considered *495 in relation to the nature and extent of the exempt function which they purport to serve. Thus, where income is realized by an exempt organization from activities which are in part related to the performance of its exempt functions, but which are conducted on a larger scale than is reasonably necessary for performance of such functions, the gross income attributable to that portion of the activities in excess of the needs of exempt functions constitutes gross income from the conduct of unrelated trade or business. Such income is not derived from the production or distribution of goods or the performance of services which contribute importantly to the accomplishment of any exempt purpose of the organization. As we see it, the foregoing regulations establish three levels of possible tax impact: (1) a trade or business which is sufficiently causally related, both in type and volume, to the exempt functions of an organization qualified under section 501(c)(3) so as neither to jeopardize its exemption or justify the imposition of the unrelated business tax under sections 511 through 515. In *496 this context, the fact that the trade or business involved is commercial in nature is immaterial. See section 1.513-1(d)(4)(iv), Example (5) Income Tax Regs. See also Squire v. Students Book Corp., 191 F.2d 1018, 1020 (9th Cir. 1951). (2) a trade or business which, although sufficiently causally related in type to an organization's exempt function, is conducted at such a level as to expose the organization to the unrelated business tax but not so as to justify the denial of the organization's exemption. Cf. Iowa State University of Science & Tech. v. United States,500 F.2d 508 (Ct. Cl. 1974); (3) a trade or business which, although ostensibly causally related in type to an organization's exempt function, is carried on in such a volume that it constitutes the primary purpose of the organization so that such organization should not be accorded exempt status. See American Institute For Economic Research v. United States,302 F.2d 934 (Ct. Cl. 1962). In the instant case, the issue presented by category (2) above is not before us. Respondent has not made any claim that petitioner is subject to the unrelated business tax on *497 the commissions derived from its procurement activities. Accordingly, we do not reach the question whether petitioner's procurement activities reached such a level that the income therefrom should be at least partially considered subject to the unrelated business tax. Cf. Santa Barbara Club v. Commissioner,68 T.C. 200, 203 (1977); sec. 1.513-1(d)(3), quoted at p. 12, supra. In so stating, we are not unmindful that the lines of demarcation among the three above-mentioned categories are not always clearly discernible so that some of the ingredients of a determination with respect to liability of an exempt organization for the unrelated business tax are at least tangentially involved in determining the applicability of categories (1) and (3). Nor do we have to determine whether petitioner necessarily falls within category (1) in order to be exempt. In the context of the issue place before us, petitioner's position herein should be sustained if we decide that it does not fall within category (3). While the evidence is far from conclusive, we are satisfied on the basis of the record before us, that petitioner has carried its burden of proof on this score. *498 Initially, we note that more than 80 percent of the salaries paid by AAPC were paid to individuals directly involved in the educational program conducted by it, and approximately 25 percent of the staff time was spent in direct contact with the students in connection with actual on-the-job training. It is reasonable to infer that additional staff time was expended on preparation for such direct contact, and the support services ancillary to the training. In addition to the efforts spent directly on the on-the-job training, AAPC supervised the formal instruction at Fordham University, tested the trainees upon completion of that program, arranged special tutoring where necessary, and conducted special educational programs which offered instruction in various facets of procurement and commercial processes. The time expended on these matters was in furtherance of AAPC's educational purposes. A significant portion of the procurement, (aside from that portion in which trainees actively participated) appears to have been reasonably necessary for the accomplishment of petitioner's educational goals. First, as part of the training process, trainees were assigned to work on a simulated *499 purchasing exercise based upon a procurement implementation project that had earlier been performed by AAPC. Second, the educational program envisioned instruction in general principles of procurement, and practices and procedures specific to the countries to which the trainees would return. It is reasonable to infer that, to satisfy these educational goals, petitioner needed a backlog of projects suitable as training exercises for individuals from numerous African countries, and a variety of current projects from such countries for their on-the-job training. Thus it appears that more projects were required that would be necessary for general training of the trainees. In sum, petitioner's procurement activities ostensibly furthered its educational and training program. On-the-job training, an integral element of the program, required an ongoing procurement operation to which the students could be assigned. At the very least, such training gave trainees valuable experience which would better prepare them for handling procurement on their return to their native lands. In the context of the stipulated facts herein, to the extent that petitioner's procurement activity might be considered *500 unrelated, it was secondary in purpose to petitioner's organization and operation. Compare Scripture Press Foundation v. United States,285 F.2d 800 (Ct. Cl. 1961). [3] Accordingly, we hold that petitioner is entitled to an exemption from taxation under section 501(c)(3) for the years in issue. In view of our conclusion, we do not reach the issue presented by petitioner's alternative argument. See p.9, supra. Decision will be enterred for petitioner. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.↩
2. We are constrained to observe that, in a situation such as is involved herein, where the policies of another agency of the United States were being furthered, respondent might well have perceived some degree of responsibility to come forward with some evidence as to the facts of petitioner's actual operations which should cause it not to be exempt, even though he did not have the burden of proof.↩
3. The mere fact that such activity was substantial and produced considerable income does not require a different conclusion. See sec. 1.513-1(d)(3), quoted at p.12, supra↩.